# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| CANAL INSURANCE COMPANY, )<br>)<br>Plaintiff/Counter-Defendant, )<br>)<br>v. )<br>)<br>MONTELLO, INC. )<br>)<br>Defendant/Third-Party )<br>Plaintiff/Counter-Claimant, )<br>)<br>v. )<br>)<br>HARTFORD FINANCIAL SERVICES )<br>GROUP, INC., CONTINENTAL )<br>CASUALTY COMPANY, HOUSTON )<br>GENERAL INSURANCE COMPANY, )<br>NATIONAL INDEMNITY COMPANY, )<br>SCOTTSDALE INSURANCE )<br>COMPANY, & TWIN CITY FIRE )<br>INSURANCE COMPANY, )<br>)<br>Third-Party Defendants. ) | Case No. 10-CV-411-JHP-TLW |

## OPINION & ORDER

Before the Court is Third-Party Defendant National Indemnity Company's ("NICO") Motion for Judgment on the Pleadings (Docket No. 88), Defendant/Third-Party Plaintiff Montello, Inc.'s Response to the Motion for Judgment on the Pleadings (Docket No. 90), and NICO's Reply to Montello's Reponse (Docket No. 91). For the reasons cited herein, NICO's Motion for Judgment on the Pleadings is GRANTED.

### FACTS and PROCEDURAL HISTORY

This case was instigated as a declaratory judgment action by Plaintiff/Counter-Defendant Canal Insurance Company ("Canal") against Defendant/Counter-Claimant/Third-Party Plaintiff Montello, Inc. on June 25, 2010. Docket No. 2. Montello responded by filing (a) an Answer to

Canal's Complaint (Docket No. 20), (b) a counterclaim against Canal for declaratory judgment and Breach of Contract (Docket No. 21), and (c) a third-party complaint against a number of third-party defendants, including NICO, requesting a declaratory judgment against Continental Casualty Company (d/b/a CNA, hereinafter "CNA") and NICO, among others (Docket No. 22). NICO answered the Third-Party Complaint and also filed this Motion for Judgment on the Pleadings, pursuant to Fed. R. Civ. P. 12(c). Docket Nos. 79, 88.

Montello "was a distributor of products used in the oil-drilling industry." Montello's Answer to Canal's Complaint at 2, Docket No. 20. One product distributed by Montello for a period of time was "a drilling mud additive that was asbestos." *See id.* Montello has now "been sued by many individuals who were allegedly exposed to asbestos through Montello's products." *See id.* The parties refer to these numerous lawsuits brought by individuals against Montello as the "Underlying Litigation." *See, e.g., id.* The Underlying Litigation has prompted Montello to seek liability coverage from the group of insurers involved in this case, most[1] of whom are alleged to have insured Montello during the time period it distributed products containing asbestos. *See* Third-Party Complaint at 3-4, 8, Docket No. 22; Counterclaim at 2, Docket No. 21. In essense, this case is one in which the parties are seeking a declaratory judgment regarding which of them, if any, must "foot the bill" for the costly and expansive[2] asbestos litigation in

---

[1]*See infra* n.3.

[2]In its Third-Party Complaint, Montello relates that,
Montello is presently named in hundreds of pending liability suits in various states, alleging damages, including personal injury, and wrongful death and other damages, as a result of alleged exposure to products allegedly manufacturer [*sic*], distributed, sold or otherwise put into the stream of commerce by Montello in the State of Oklahoma, and elsewhere. Montello continues to be sued for liability in Oklahoma and other states. . . . To date, Montello has incurred substantial damages because of

2

which Montello must defend itself.

Unlike the majority of the insurance companies in this case, NICO is not alleged to have insured Montello during the time period that Montello sold products containing asbestos.[3] Instead, Montello alleges that NICO is liable to it as a result of a recent reinsurance agreement NICO made with Continental Casualty Company/CNA, who is alleged to be a direct insurer of Montello during the relevant time period. Third-Party Complaint at 9, Docket No. 22. Montello argues that this "retroactive" reinsurance agreement, in which it alleges that "CNA's asbestos and environmental pollution liabilities will be transferred to NICO," thus shifting responsibility for a portion of Montello's asbestos litigation to NICO, making NICO directly liable to Montello for any covered loss. *See id.* Unsurprisingly, NICO opposes this proposition, and instead argues

---

    investigating, defending against, and paying damages resulting from the underlying litigation.
Third-Party Complaint at 7, Docket No. 22.

[3] A compilation of Montello's allegations in the Counterclaim (Docket No. 21 at 2) and Third-Party Complaint (Docket No. 22 at 8) yields the following schedule for which party insured Montello at which time:

| Time Period | Insurance Company |
| --- | --- |
| December 1968 - December 1974 | Continental Casualty Company/ "CNA" |
| December 1978 - March 1981 | Houston General Insurance Company |
| March 1, 1981 - March 1, 1982 | Canal Insurance Company |
| March 1982 - March 1983 | Twin City Fire Insurance Company |
| March 1, 1983 - March 1, 1985 | Canal Insurance Company |
| March 1985 - March 1986 | Scottsdale Insurance Company |

Third-Party Defendants NICO (movant in the Motion for Judgment on the Pleadings *sub judice*) and Hartford Financial Services Corporation (movant in the pending Motion to Dismiss, *see* Docket Nos. 60, 62, 82, 83, 86, 87) are not alleged to have directly insured Montello.

that under current law the reinsurance agreement does not make it directly liable to Montello. *See* Motion for Judgment on the Pleadings at 1-2, Docket No. 88.

## DISCUSSION

In the motion *sub judice*, defendant NICO brings a Rule 12(c) motion for judgment on the pleadings based on the argument that Montello has failed to state a claim against it. Fed. R. Civ. P. 12(c) states that "[a]fter the pleadings are closed–but early enough not to delay trial–a party may move for judgment on the pleadings." Rule 12(h)(2)(B) authorizes a party to move for judgment for "failure to state a claim upon which relief may be granted" in the context of a Rule 12(c) motion. *See* Fed. R. Civ. P. 12(h)(2)(B); Nat'l Ass'n of Pharmaceutical Mfrs., Inc. v. Ayerst Laboratories, 850 F.2d 904, 910 n. 2 (2d Cir. 1988); *see* Lipari v. U.S. Bancorp, N.A., 345 Fed. App'x 315, 317 (10th Cir. 2009) (opinion not selected for publication). When a motion for judgment on the pleadings is brought before the court asserting that plaintiff failed to state a claim upon which relief can be granted, "the court simply treats the motion as if it were a motion to dismiss." *Nat'l Ass'n of Pharmaceutical Mfrs., Inc.*, 850 F.2d at 910 n.2. Thus, applying the traditional method employed on a motion to dismiss, the Court will accept as true all of the factual allegations contained in the complaint. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). The court finds that this motion is properly adjudicated on the pending Motion for Judgment on the Pleadings; accordingly, the court accepts as true all facts as stated by Third-Party Complainant Montello.

Montello cites only the reinsurance contract between CNA and NICO as reason for holding NICO directly liable for its litigation costs:

> . . . Montello alleges that on July 15, 2010, CNA announced that its principal operating subsidiary Continental Casualty Company, along with its insurance

4

> subsidiaries have entered into an agreement with NICO, under which the CNA's asbestos and environmental pollution liabilities will be transferred to NICO. . . . Montello further alleges that under the terms of the transaction, effective January 1, 2010, CNA ceded or will cede approximately $1.6 billion of net asbestos and environmental liabilities to NICO *under a retroactive reinsurance agreement with an aggregate limit of $4 billion.*
>
> . . . Montello alleges that NICO deposited or will deposit $2.2 billion in a collateral trust for the benefit of CNA.
>
> . . . Montello alleges that NICO has responsibility for the CNA companies' asbestos and environmental claims and insuring contracts, and CNA's Insurance Policies at issue herein.

Third-Party Complaint at 9, Docket No. 22 (emphasis supplied). Whether the reinsurance agreement between NICO and CNA provides a direct cause of action to CNA's original insured parties, such as Montello, is the primary issue to be resolved on this motion.

It is a basic rule of insurance law that the existence of a reinsurance contract does not allow an insured to proceed directly against the reinsurer, generally even if the original insurerer becomes insolvent. 1A COUCH ON INSURANCE § 9:30. The parties agree on the basic application of this general rule to this motion. *See* Motion for Judgment on the Pleadings at 5-6, Docket No. 88; Response at 5-6, Docket No. 90. Thus, under the general rule, NICO would not be directly liable to Montello simply because NICO has reinsured Montello's original insurer, CNA. However, there are two exceptions to this general rule regarding reinsurance, each of which Montello argues demonstrate that NICO may be held directly liable under CNA's original contract. The court will consider the application of each of these exceptions individually.

The first exception argued by Montello is that the reinsurance contract between NICO and CNA contains a "cut through" clause (*see generally* Response at 5-10, Docket No. 90),

which under New York law[4] would allow the insured to proceed directly against the reinsurer (*see* Trans-Resources, Inc. v. Nausch Hogan & Murray, 298 A.D.2d 27, 32-33, 746 N.Y.S.2d 701, 704 (N.Y.App.Div. 2002) (recognizing significance of cut-through provision under New York law)).  COUCH ON INSURANCE describes cut through clauses:

> An express provision that confers upon the original insured direct rights against the reinsurer are commonly referred to as "cut through clauses."  While a "cut through clause" originally applied only in the event of the insolvency of the original insurer, the clause may be written so as to apply without such limitation.
>
> Even in the absence of an express provision, such a right may be implied through the conduct of the reinsurer. Where the original insured consistently deals directly with the reinsurer, bypassing the original insurer, the reinsurer may become directly liable to the insured.

1A COUCH ON INSURANCE § 9:30.  The existence of a cut through clause in the contract would indeed provide to Montello a direct cause of action against NICO, but the court finds that the NICO-CNA Reinsurance Agreement and other agreements incorporated therein does not contain a cut through clause, either express or implied.

Analysis of the NICO-CNA contract demonstrates that there is no express cut through provision.  In fact, Montello has not argued that the contract contains an express cut through clause.  Instead, Montello has argued that the NICO-CNA contract contains an *implied* cut through provision.  To this end, Montello highlights portions of the NICO-CNA Reinsurance Agreement and the incorporated Administrative Services Agreement, in which NICO agrees to "perform all administrative services" with respect to insurance policies issued by CNA.  *See* Reinsurance Agreement ¶ 1.1, 4.1, Docket No. 79-1.  While NICO has agreed to undertake

---

[4] The contracts at issue in this motion are to be interpreted according to New York law.

extensive administrative services[5] with regard to the reinsured policies issued by CNA, the court finds that this agreement is insufficient to establish an implied cut through provision in favor of Montello, for reasons set forth below.

First, both the Reinsurance Agreement and the Administrative Services Agreement executed between NICO and CNA contain express negation clauses, in which NICO disavows undertaking any direct liability to a third party by way of the reinsurance agreement. Paragraph 22.8 of the Reinsurance Agreement is entitled "<u>No Third Party Beneficiaries</u>" and states: "Nothing in this Reinsurance Agreement is intended or shall be construed to give any Person, other than the Parties, any legal or equitable right, remedy, or claim under or in respect of this Reinsurance Agreement or any provision contained herein." Docket No. 79-1. Paragraph 19.8 of the Administrative Services Agreement contains identical language disavowing the intent of

---

[5]Paragraph 4.1 of the Administrative Services Agreement provides that
(a)   In accordance with the terms of the Administrative Services Agreement, Administrator shall provide and perform all Administrative Services with respect to the Business Covered, including:
  (i)   to adjust, handle, agree, settle, pay, compromise or repudiate any claims or any other liability, outgoing or expense;
  (ii)  to commence, conduct, pursue, settle, appeal or compromise any legal arbitration or other proceedings whatsoever;
  (iii) to agree, on behalf of Reinsureds, to fund the obligations of any third party in connection with any A&P claim . . . .
(b)   The Administrative Services which will be undertaken by Administrator will include all matters required to give full effect to the terms of the LPT Reinsurance Agreement. Reinsureds shall have no authority to settle, commute or compromise any direct A&P Claim or any reinsurance claim arising from an A&P claim, except with the consent of Administrator . . . .
Administrative Services Agreement ¶ 4.1(a), (b), Docket No. 90-2.

7

the parties that any third party receive any interest pursuant to the Administrative Services Agreement.  Docket No. 90-2.

Under New York law, the existence of a "negating clause" is dispositive on the issue of whether the contract creates third-party beneficiaries.  The Second Circuit, interpreting New York contract law, stated that "[u]nder New York law, the effectiveness of a negating clause to preclude third-party beneficiary status is well-established: '[w]here a provision exists in an agreement expressly negating an intent to permit enforcement by third parties . . . that provision is decisive.'"  India.com, Inc. v. Dalal, 412 F.3d 315, 321-322 (2d Cir. 2005) (quoting Nepco Forged Prods., Inc. v. Consolidated Edison Co. of N.Y., Inc., 470 N.Y.S.2d 680, 681 (N.Y. App. Div. 1984)) (collecting cases).  In *India.com*, the Second Circuit found that the express negating clause was dispositive of the third-party beneficiary issue, even when the third party claiming rights under the contract was specifically named in the contract as a person to whom specific commissions would be paid.  *See id.* at 322.  The negating clauses in the Reinsurance and Administrative Services Agreements between NICO and CNA are similarly express.  It follows that under New York law, no third parties are to receive any benefits, including a direct cause of action against the reinsurer NICO, as a result of the reinsurance agreement.  Montello is not a party to the agreements between NICO and CNA, therefore it would be contrary to the clearly-expressed intent found in the negating clauses to interpret these agreements as containing an implied cut-through clause granting Montello a right to sue NICO directly.

Second, the court finds that Montello's reliance on *Trans-Resources, Inc. v. Nausch Hogan & Murray* is misplaced: *Trans-Resources* is distinguishable on its facts.  In *Trans-Resources*, the Supreme Court of the Appellate Division of New York interpreted language in

the reinsurance agreement obligating reinsurers "to pay directly to the named insured . . . with respect to any claim under the policy," and found that such language constituted a cut through clause. 746 N.Y.S.2d 701, 705-06 (N.Y. App. Div. 2002). While the language interpreted to be a cut through provision is remarkably similar to that contained in the Administrative Services Agreement between NICO and CNA, *Trans-Resources* is distinguishable because the final reinsurance agreement in *Trans-Resources* did not contain a negating clause, while both the Reinsurance Agreement and Administrative Services Agreement in this case did contain negating clauses. *See* Jurupa Valley Spectrum, LLC v. Nat'l Indemnity Co., 555 F.3d 87, 89 (2d Cir. 2009) (stating that final reinsurance policy issued in *Trans-Resources* did not contain a negating clause).

Factually, this case is more similar to the Second Circuit's *Jurupa Valley Spectrum v. National Indemnity Co*., in which the plaintiff therein similarly argued under *Trans-Resources* that the reinsurance agreement contained an implied cut through provision despite the existence of a negating clause. *See id.* The Second Circuit rejected the plaintiff's argument:

> Jurupa contends that this language is substantially identical to the "cut through" provision recognized in *Trans-Resources* . . . . We disagree. In the first place, the language of *Trans-Resources* included the agreement of the insurer "to pay directly to the named insured." The language of the present reinsurance, while it provides that the reinsurer "shall pay all amounts due Insured" does not specify to whom the payments will be made. In addition, Article 14 of the Reinsurance Agreement explicitly provides that no one other than the reinsured shall have any rights or remedies against the reinsurer. The Reinsurance Agreement cannot reasonably be read to provide a "cut through."

*Id.* (internal citation omitted). The Second Circuit's analysis applies in this case. Through the Administrative Services Agreement, NICO has agreed to administer claims "on behalf of" CNA (*see* Administrative Services Agreement ¶ 4.1) and Montello alleges that NICO has "deposited

or will deposit $2.2 billion in a collateral trust *for the benefit of* CNA" (Third-Party Complaint at 9, Docket No. 22). These agreements that authorize NICO to administer claims for "the benefit of" or "on behalf of" the reinsured cannot be read to create a direct link to the original insured. In contrast, the language in the *Trans-Resources* clearly instructed the reinsurer "to pay directly to the named insured." Furthermore, as already stated, the clear negating clause demonstrates that the parties had no intent to benefit third parties such as Montello. Any such benefits received by Montello are therefore merely incidental and not intentional. There is no cut through clause granting Montello the right to sue NICO directly.

The second exception argued by Montello is that the nature of the Reinsurance Agreement between NICO and CNA created assumption reinsurance. "Assumption reinsurance" occurs when "the reinsurer steps into the shoes of the ceding company with respect to the reinsured policy, assuming all its liabilities and its responsibility to maintain required reserves against potential claims" Colonial Am. Life Ins. Co. v. Comm'r of Internal Revenue, 491 U.S. 244, 247 (1989). Under assumption reinsurance, "[t]he reinsurer . . . receives all premiums directly and becomes directly liable to the holders of the policies it has reinsured." *Id.* Again, the Second Circuit's analysis in *Jurupa* directly applies:

> The district court correctly held that the Reinsurance Agreement is not assumption reinsurance. . . . [The Agreement] limited the amount of Frontier[ Insurance Company's] liability that NICO undertook. Moreover, NICO assumed only Frontier's "net" liabilities, defined as Frontier's liability net of Frontier's other reinsurance. It is clear NICO did not assume *all* of Frontier's liabilities. The Reinsurance Agreement is therefore not assumption insurance.

*Jurupa Valley Spectrum*, 555 F.3d at 89. It is similarly clear in this case that NICO did not assume *all* of CNA's liabilities: the Reinsurance Agreement states that NICO's "aggregated limit of liability for Ultimate Net Loss shall be no greater than Four Billion Dollars ($4,000,000,000)"

10

(Reinsurance Agreement ¶ 2.1, Docket No. 79-1) and "Ultimate Net Loss" is defined to include most of CNA's liabilities *less* amounts paid by third party reinsurance contracts and any other recoveries (*id.* ¶ 2.3). Therefore, because NICO has not assumed *all* of CNA's liabilities, the reinsurance contract does not create assumption reinsurance, and NICO is not directly liable to Montello under a theory of assumption insurance.

## CONCLUSION

For the reasons cited herein, the court finds that the reinsurance agreement between NICO and CNA does not provide Montello a direct cause of action against NICO. Therefore, Montello cannot maintain a direct cause of action against NICO, and judgment on the pleadings is proper. NICO's Motion for Judgment on the Pleadings (Docket No. 88) is therefore GRANTED.

IT IS SO ORDERED this 26^(TH) day of September, 2011.

James H. Payne
United States District Judge
Northern District of Oklahoma