## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| CANAL INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff | ) | |
| v. | ) | |
| | ) | |
| MONTELLO, INC., | ) | |
| | ) | Case No. 10-CV-411-JHP-TLW |
| Defendant/Third-Party | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CONTINENTAL CASUALTY CO., *et al.*, | ) | |
| | ) | |
| Third-Party Defendants | ) | |

### THIRD-PARTY DEFENDANT CONTINENTAL CASUALTY COMPANY'S MOTION TO STRIKE THE REPORT OF ROBERT HUGHES AND TO BAR THE TESTIMONY OF ROBERT HUGHES AND INTEGRATED BRIEF IN SUPPORT

Patrick M. Ryan, OBA#7864
Paula M. Jantzen, OBA#20464
RYAN WHALEY COLDIRON SHANDY PLLC
900 Robinson Renaissance
119 North Robinson
Oklahoma City, OK  73102

- and -

William M. Cohn (*pro hac vice*)
Brian C. Coffey (*pro hac vice*)
COHN BAUGHMAN & MARTIN
333 West Wacker Drive, Suite 900
Chicago, Illinois 60606

ATTORNEYS FOR THIRD-PARTY
DEFENDANT CONTINENTAL CASUALTY
COMPANY, improperly identified as
"CONTINENTAL CASUALTY CO., d/b/a CNA
COMMERCIAL INSURANCE COMPANY d/b/a
CNA INSURANCE COMPANIES"

## TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................................ 1

II.  ARGUMENT .............................................................................................................. 4

   A.  The Court Must Act As Gatekeeper To Prevent Admission Of Unreliable
Testimony ....................................................................................................................... 4

   B.  Mr. Hughes' Report And Testimony Do Not Satisfy The Requirements Set Forth In
*Daubert* ......................................................................................................................... 5

     1.   Mr. Hughes' Report And Testimony Rely On Insufficient Data And Are Not
Grounded In Methods And Procedures Of Science ........................................................ 6

     2.   Mr. Hughes Rendered Opinions Despite Not Having Access To Documents He
Requested, Not Having Access To Potentially Knowledgeable Witnesses, And Not
Reviewing Potentially Relevant Documents ................................................................ 11

     3.   Mr. Hughes' Report Includes Statements Of Fact, Not Opinions, That Are
Demonstrably Incorrect ............................................................................................... 18

     4.   Mr. Hughes' Opinions Improperly Rely On Hearsay ............................................. 22

     5.   Other Courts Have Excluded Mr. Hughes' Testimony In Insurance Coverage
Litigation ..................................................................................................................... 23

III. CONCLUSION ......................................................................................................... 23

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Cohlmia v. Ardent Health Services*, LLC, 254 F.R.D. 426 (N.D. Okla. 2008) ............................ 17

*Combs v. Shelter Mutual Ins. Co.*, 2007 WL 4748227 (E.D. Okla.) ..................................... passim

*Cornwell v. Union Pacific Railroad*, 2010 WL 3521674 (N.D. Okla.)................................... 5, 11

*Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993)..................................................... 4, 5

*Elcock v. Kmart Corp.*, 233 F. 3d 734 (3rd Cir. 2000) ................................................................ 22

*General Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997)................................................................. 5

*Gomez v. Martin Marietta Corp.,* 50 F.3d 1511 (10th Cir.1995) ............................................ 4, 11

*Green Textile Associates, Inc. v. Federal Ins. Co.*, 2006 WL 1677184 (D.S.C. 2006)............... 23

*In re Paoli RR. Yard PCB Litigation,* 35 F.3d 717 (3rd Cir.1994)................................................ 5

*Kumho Tire Co. v. Carmichael,* 526 U.S. 137 (1999) ............................................................... 4, 5

*Lyman v. St. Jude Med. S.C., Inc.*, 580 F. Supp. 2d 719 (E.D. Wis. 2008) ................................. 15

*Mitchell v. Gencorp Inc.,* 165 F.3d 778 (10th Cir.1999) .......................................................... 4, 5

*North American Specialty Ins. Co. v. Britt Paulk Ins. Agency, Inc.*, 2007 WL 2694323 (E.D.
   Okla.) ..................................................................................................................... 5, 23

*Olympic Pipeline Co. v. Pacific Employers Ins. Co.*, Cause No. 01-2-16599-2 (King County
   Superior Court) ............................................................................................................... 23

*Palmer v. Asarco*, 2007 WL 2254343 at *3 (N.D. Okla.) ........................................................... 17

*Plantation Pipeline Co. v. Continental Cas. Co.*, 2008 WL 4737163 (N.D. Ga. 2008)............... 23

*Quinones-Pacheco v. American Airlines, Inc.*, 979 F. 2d 1 (1st Cir. 1992) ................................. 22

*Rosen v. Ciba-Geigy Corp.,* 78 F.3d 316 (7th Cir.1996).............................................................. 5

**Rules**

Federal Rules of Evidence 702 ...................................................................................................... 4

Now comes Third-Party Defendant Continental Casualty Co., improperly identified in the Third-Party Complaint of Montello, Inc. ("Montello") as "Continental Casualty Co., d/b/a CNA Commercial Insurance Company d/b/a CNA Insurance Companies" ("Continental"), through counsel, RYAN WHALEY COLDIRON SHANDY PLLC and COHN BAUGHMAN & MARTIN, and moves this Court to enter an order striking the report of Montello's proffered expert, Robert Hughes, and barring the testimony of Mr. Hughes.  In support of its Motion, Continental states as follows:

## I.      INTRODUCTION

This case involves claims for insurance coverage under two "excess umbrella liability" insurance policies alleged to have been issued by Continental to Montello.  Montello concedes that it does not have copies of either of the alleged Continental policies, but maintains that the existence, terms, and conditions of these alleged policies can nevertheless be established through certain "secondary evidence."  This "secondary evidence" includes the report and testimony of Robert Hughes, a purported "expert" in the reconstruction of missing insurance policies.  The record before this Court, detailed below, demonstrates that Mr. Hughes' opinions (a) lack any basis in reliable facts or data, (b) are not the product of sound reasoning and methodology, and (c) amount to little more than speculation and conjecture.  Indeed, Mr. Hughes concedes that the principal opinion he now presents to this Court is 180° different from the conclusion he initially reached.  Moreover, Mr. Hughes admits that his decision to reverse his opinion was not based on any investigation or analysis of evidence, but from the "serendipitous" discovery of documents contradicting Mr. Hughes' incorrect understanding of Oklahoma insurance regulations.

Mr. Hughes' primary opinion in this case is that the alleged Continental policies would have included certain "standard form" language attached as Exhibit E to Mr. Hughes' report.[1]  However, Mr. Hughes concedes that he previously rejected Exhibit E as a template for the purported policy language and instead thought different language attached to Mr. Hughes' report as Exhibit D would have been used.  Mr. Hughes testified:

> Q:      [Originally], you conclude that Exhibit D is what the Montello policy most likely looks like?
>
> A:      Yes.
>
> Q:      And not Exhibit E?
>
> A:      Right.
>
> Q:      Okay.  And so you just leave Exhibit E on the shelf?
>
> A:      Right.
> Q:      What was the basis of that conclusion?
>
> A:      I didn't know at the time that – I had actually seen, in my practice, more policies that were similar to Exhibit D used by Continental for umbrella policies during this particular period than I had seen policies that were like Exhibit E used by Continental during this particular period of time.  I also didn't really realize that because Oklahoma – let me back up.  Normally, you don't find a file – an umbrella policy's file for approval in prior approval states like Oklahoma because they're written in the surplus lines market.  And this particular period of time in the '60s and '70s, particularly in the '70s, was a very confusing time regulatorily speaking . . .  This policy that I've produced as Exhibit D is a policy that you would normally see produced as a – on a surplus lines basis and, frankly, I thought that was most likely the edition.  I knew that the policies that I had that were similar to Exhibit E were the forms that were used by Continental in prior approval states.  *I didn't realize that Oklahoma was a prior approval state* until [Montello's counsel] produced the documentation that had been filed by Continental with Oklahoma.

---

1       As discussed in Continental's memorandum in support of its motion for summary judgment, filed contemporaneously herewith, Mr. Hughes qualifies even this opinion, stating that any Continental policy could actually have been written on *at least two* forms and possibly others.  Continental does not concede that any "standard form" language was used.

* * *

Q:    Okay.  What did you do to check on whether Oklahoma was the state that required prior approval [of] forms?

A:    *We – the documentation regarding the status for approval in the various states for more than 20 years ago is very sketchy and difficult to obtain.  We have a little bit of it on some states in our library.  We didn't have anything on Oklahoma.  And I couldn't find anybody who did.*  I was, frankly, quite surprised when Mr. Hartman walked in and handed me the documents that he had found in his files.  *So it was purely serendipitous that we discovered those documents.*

Affidavit of Brian C. Coffey ("Coffey Aff.")[2], Ex. 1 (Hughes Dep., 37 – 38, 44).[3]  In other words,

Mr. Hughes misunderstood the "confusing" state of Oklahoma insurance regulations *circa* 1960s and

1970s, was unable to confirm or refute his misunderstanding because "documentation . . . is very

sketchy and difficult to obtain," and then relied on documents that were given to him as a result of

"pure serendipity."  Mr. Hughes also admits that he did not confirm the source of these documents,

when they were obtained, who obtained them, or whether he was given a complete set of the

documents.  Coffey Aff., Ex. 1 (Hughes Dep., 53).

This example, and the many others discussed in detail below, make clear that Mr. Hughes'

methods do not yield opinions that would be either reliable or helpful to the Court.  For this reason,

the Court should strike Mr. Hughes' report and not permit Mr. Hughes to testify.

---

2    To avoid unnecessary duplication in the record, Continental's references to the Affidavit of Mr. Coffey are intended to reference the Affidavit which is an exhibit to Continental's Motion for Summary Judgment (*see* Doc. No. 104) filed contemporaneously with the filing of this Motion.

3    To be clear, neither Montello nor Montello's counsel provided Mr. Hughes with copies of any policies, or even any portions of policies, allegedly issued to Montello by Continental.  Rather, counsel for Montello provided Mr. Hughes with documents that Mr. Hughes understands to be forms approved for use (but not required to be used) in Oklahoma.

II.    **ARGUMENT**

A.    **The Court Must Act As Gatekeeper To Prevent Admission Of Unreliable Testimony**

The legal standards governing whether a proposed expert's testimony and opinions should be accepted by the Court are well settled.  Those standards have been articulated by this Court on numerous occasions as follows:

"It is now well established that Fed.R.Evid. 702 imposes on a district court a gatekeeper obligation to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 589 (1993). This gatekeeper function requires the judge to assess the reasoning and methodology underlying the expert's opinion, and determine whether it is both scientifically valid and applicable to a particular set of facts. *Id.* at 592-93. The Supreme Court has made clear that "where [expert] testimony's factual basis, data, principles, methods, or their application are called sufficiently into question ... the trial judge must determine whether the testimony has a 'reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 149 (1999) (*quoting Daubert,* 509 U.S. at 592).

To be reliable under *Daubert,* an expert's scientific testimony must be based on scientific knowledge, which "implies a grounding in the methods and procedures of science" based on actual knowledge, not "subjective belief or unsupported speculation." 509 U.S. at 590. In other words, "an inference or assertion must be derived by the scientific method ... [and] must be supported by appropriate validation-i.e. 'good grounds,' based on what is known." *Id.* While expert opinions "must be based on facts which enable [the expert] to express a reasonably accurate conclusion as opposed to conjecture or speculation, ... absolute certainty is not required." *Gomez v. Martin Marietta Corp.,* 50 F.3d 1511, 1519 (10th Cir.1995) (quotation omitted). "The plaintiff need not prove that the expert is undisputably correct or that the expert's theory is 'generally accepted' in the scientific community." *Mitchell v. Gencorp Inc.,* 165 F.3d 778, 781 (10th Cir.1999). Instead, the plaintiff must show that the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which satisfy Rule 702's reliability requirements. *Id.*

To assist in the assessment of reliability, the Supreme Court has listed four nonexclusive factors that the trial court may consider: (1) whether the opinion at issue is susceptible to testing; (2) whether the opinion has been subjected to peer review; (3) whether there is a known or potential rate of error associated with the methodology used and whether there are standards controlling the technique's operation; and (4) whether the theory has been accepted in the scientific community.

*Daubert,* 509 U.S. at 593-94. As noted, the list is not exclusive, and district courts applying *Daubert* have broad discretion to consider a variety of other factors. *Kuhmo Tire,* 526 U.S. at 150. ("[W]e can neither rule out, nor rule in, for all cases and for all time the applicability of the factors mentioned in *Daubert* ... Too much depends upon the particular circumstances of the particular case at issue.").

Generally, the district court should focus on an expert's methodology rather than the conclusions it generates. *Daubert,* 509 U.S. at 595. However, an expert's conclusions are not immune from scrutiny: "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997) (*"[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert."* ). Under *Daubert,* "any step that renders the analysis unreliable ... renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology." *Mitchell,* 165 F.3d at 782 (quoting *In re Paoli RR. Yard PCB Litigation,* 35 F.3d 717, 745 (3rd Cir.1994)). It is critical that the district court determine "whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." *Id.* at 783 (*quoting Rosen v. Ciba-Geigy Corp.,* 78 F.3d 316, 318 (7th Cir.1996)). Regardless of the specific factors at issue, the purpose of the *Daubert* inquiry is always "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kuhmo Tire,* 526 U.S. at 152.

*Combs v. Shelter Mutual Ins. Co.*, 2007 WL 4748227 (E.D. Okla.) (granting motion *in limine* to bar expert testimony as inconsistent with requirements of *Daubert*); *North American Specialty Ins. Co. v. Britt Paulk Ins. Agency, Inc.*, 2007 WL 2694323 (E.D. Okla.) (same); *Cornwell v. Union Pacific Railroad*, 2010 WL 3521674 (N.D. Okla.) (motion to bar expert testimony granted in part and denied in part).

### B.   Mr. Hughes' Report And Testimony Do Not Satisfy The Requirements Set Forth In *Daubert*

As discussed in detail below, the unambiguous record before the Court establishes that Mr. Hughes' opinions do not satisfy the requirements of *Daubert*.  Thus, the Court should strike Mr. Hughes' report and prohibit him from testifying.

1.      **Mr. Hughes' Report And Testimony Rely On Insufficient Data And Are Not Grounded In Methods And Procedures Of Science**

In order for an experts' opinions and testimony to be admissible, they must be grounded in methods and procedures of science, and be based on *actual knowledge* rather than "subjective belief or unsupported speculation." *Combs, supra*, at *1. Through his testimony, Mr. Hughes confirms that his opinions are not based on actual knowledge or methods and procedures of science, but instead rely on subjective belief and unsupported speculation.

For instance, while Mr. Hughes states that his opinions are "based in significant part upon my practical experience in the insurance industry since 1960," Coffey Aff., Ex. 2 (Hughes Rpt., 2), he concedes that his personal knowledge regarding Continental is relatively limited and came *after* the policies at issue here were allegedly issued in 1968 and 1971:

Q:      In this case, how significant a portion of – how significant is your practical experience to your ultimate conclusions?

A:      Well, I think it is very significant. The – as I said before, the – the CNA companies – and really, as far as CNA concerns, it's my – my experience as a consultant from '72 forward that's most important. We did represent CNA at my insurance agency, but they were not one of our leading carriers.

* * *

Q:      And you're talking about the '72 and later period, was it, or the '74 and later period?

A:      The '72, '72 and later period.

Q:      Okay. And prior to that?

A:      . . . I [entered] the practice of insurance in 1960, as an insurance agent. And my agency represented the CNA Group as their agent, but they were not one of our leading companies.

Q:      Okay. *And you don't recall ever placing a CNA Continental umbrella policy with an insured?*

A:      *I don't.*

6

Coffey Aff., Ex. 1 (Hughes Dep., 77, 80 – 81).   Thus, while Mr. Hughes maintains that his own industry experience is "very significant" to his opinions, Mr. Hughes concedes that any significant involvement he had with Continental came after the period relevant to this case and, moreover, *he cannot recall ever placing a Continental umbrella policy (the type of policy on which he now opines) with an insured*.   This claimed industry experience cannot provide a legitimate basis on which Mr. Hughes could render opinions, particularly as his experience lacks any direct connection to the type of alleged Continental policies at issue here and is not linked to a statistically significant sample of such policies.  *Combs, supra*, at *3.

In *Combs*, a party proffered an expert to testify as to the calculation of insurance sales commissions.   The Court rejected the expert because the witnesses' industry experience was insufficient and the witness had failed to obtain and evaluate a statistically representative sampling of the relevant contracts.   The court stated:

> Gelona's qualifications are not generally questioned by Defendants, but they do strenuously dispute his qualifications to testify in regard to the specific issues in this case, and argue his opinions are neither based upon reliable facts, nor the product of reliable methodology.   The Court agrees.   As pointed out in Defendants' Daubert motion, and reflected in Gelona's testimony before this Court, Gelona has never worked with Defendants.   He has never negotiated an agent agreement between any agent and Defendants, and has in fact never reviewed a Shelter agency agreement before consultation on this case.   He was not involved in any way in the drafting of the Agent Agreement between Plaintiff and Shelter.

> Further, Gelona's opinions are based on insufficient facts and data.   Gelona testified he primarily relied on his general background and experience in the industry and statements from five individuals associated with other insurance companies.   Although it is proper for Gelona to rely on his prior experience in the industry, interviewing a mere five insurance representatives of the thousands of insurers that do business in Oklahoma is not a reliable statistical sample from which to draw a rational inference.   Gelona is not a statistician.   Additional testimony reveals that one of the five businesses Gelona spoke with is not even licensed to do business within the State of Oklahoma.   This Court has gone to great lengths to limit the evidence in this case to similar instances occurring within the State of Oklahoma.

*Combs, supra*, at *3.  Here, Mr. Hughes' opinions suffer from a lack of supporting data that mirrors, or exceeds, the problems identified in *Combs*.  While Mr. Hughes claims to have "had the opportunity to review and opine upon hundreds, if not thousands, of umbrella and excess liability forms used by insurers throughout the world," Coffey Aff., Ex. 2 (Hughes Rpt., 3), this vague general experience is not coupled with adequate data or information related to policies like the alleged Continental policies on which Mr. Hughes opines in this case.  More specifically, while Mr. Hughes may claim to have generally considered many insurance policies over the course of his career (the details of which Mr. Hughes could not or would not provide), he reviewed only four or five "RDU" policies actually issued by a CNA company – *none of which were issued in Oklahoma, none of which were issued in the drilling sector, and some of which Mr. Hughes acknowledged were issued to much larger companies and, therefore, were "just not pertinent" here.*  Mr. Hughes testified:

> Q:     Okay.  So using your term, "CNA," how many CNA policies have you got in the library?
>
> A:     Four or five. . . . Now let me ask you: Are you talking about policies of any kind or are you talking about excess liability policies?
>
> Q:     Right now I'm talking about policies of any kind.
>
> A:     Well, we probably have 15 or 20.
>
> Q:     Okay.  And of that 15 or 20, you're saying four or five are excess liability policies?
>
> A:     I think that's right. . . .
>
> Q:     Did you look at the four or five?
>
> A:     Yes.
>
> * * *
>
> Q:     So just so we're clear.  You've never seen an RDU policy issued to an Oklahoma policy[holder], have you, right?

8

A:     Not that I recall.

Q:     Okay.  How many RDU policies have you seen?

A:     Oh, I would imagine – in my entire career?

Q:     Sure.

A:     Gosh, I would guess – it's hard to say.  Probably 100 or more.

Q:     And of those probably 100 or more, you've actually got four to five that you've had in your library?

A:     Well, that's right.  But, I mean, I don't know what your point is.  The fact is that most of the RDU policies that I originally saw were during my consulting practice with Rimco [in 1972 and after], because the Continental companies were a very popular source of excess liability coverage from our consulting clients.  And we b[]ought lots and lots of umbrella policies from Continental companies.  And I've certainly seen a lot of RDU policies, a number of RDU policies in the context of my expert witness business.  *But most of those are confidential and we don't have them in our library.*

Q:     *So you can't give me any details regarding those policies?*

A:     What?

Q:     *You can't give me any details regarding those policies?*

A:     *Well, no.  I mean, I would have to do it from memory* and I – the only thing I can tell you is that I've seen a lot of RDU policies, and I can tell you that some of them are umbrella forms like Exhibit E, some of them are umbrella forms like Exhibit D.

Q:     Have you ever seen an RDU policy issued to a policyholder in the oil services business?

A:     In the what?

Q:     The oil services or –

A:     I'm sure.

Q:     – mud drilling businesses?

A:     I'm sure I have.  I mean, I – my consulting practice was heavily oriented to

9

oil and gas, and I did a lot of servicing companies over the years.  So it would be highly unlikely that I never saw an RDU policy issued [to] an oil- and gas-oriented company, if that was your question.

Q:      Well, I guess my question was a little different.  My question was, do you recall seeing one?

A:      For an oil well service company?

Q:      Right.

A:      No, I don't.

\* \* \*

Q:      Okay.  Out of these, roughly, I guess, then, it's 2,000 to 3,000 umbrella policies; is that right?

A:      Well, at least.

Q:      All right.  How many were issued by Continental Casualty?

A:      I have no idea.

Q:      All right.  How many were issued to drilling or mud services industry insureds?

A:      I don't know.

Q:      How many were issued in Oklahoma?

A:      I don't know.

\* \* \*

Q:      *Okay.  But, in fact, you've never seen a Continental RDU policy issued in Oklahoma, right?*

A:      *Correct.*

Coffey Aff., Ex. 1 (Hughes Dep., 32,  67 – 69, 82, 136) (emphasis added).[4]  *See also Id*. at 36

---

4      Mr. Hughes also conceded that he is not a statistician and did not seek any assistance from a statistician in this matter.  Coffey Aff., Ex. 1 (Hughes Dep., 186).

(noting that "a couple" of the sample policies reviewed by Mr. Hughes were "for gigantic corporations, like ITT, that they're just not pertinent to a company like this").

In sum, Mr. Hughes formed his opinions after looking at four or five "RDU" policies, all of which were issued to out-of-state companies and some of which were issued to companies that are either unidentified or "just not pertinent" to Mr. Hughes' analysis.   This is a grossly insufficient universe of reviewable data to allow for the Court to test either Mr. Hughes' data or his methodology.  As this Court noted in *Combs:* "Although it is proper for [an expert] to rely on his prior experience in the industry, interviewing a mere five insurance representatives of the thousands of insurers that do business in Oklahoma is not a reliable statistical sample from which to draw a rational inference.  [This expert] is not a statistician".  *Combs, supra*, at *3.  Likewise, here, reviewing four or five "RDU" policies – none of which were issued to Oklahoma policyholders – is not a reliable statistical sample.  Moreover, given the scant materials reviewed by Mr. Hughes, any peers in the insurance community could not review Mr. Hughes' methods or conclusions and there is no way to determine the rate of error in his approach.  (Of course, the evidence here suggests a very high rate of error (*i.e.*, 100%) because Mr. Hughes reversed his opinion by 180° after Montello's lawyer "serendipitously" provided additional documents on the eve of Mr. Hughes' report.)

2.    **Mr. Hughes Rendered Opinions Despite Not Having Access To Documents He Requested, Not Having Access To Potentially Knowledgeable Witnesses, And Not Reviewing Potentially Relevant Documents**

"Expert opinions 'must be based on facts which enable [the expert] to express a reasonably accurate conclusion as opposed to conjecture or speculation.'"  *Cornwell, supra*, at *4 (*quoting Gomez*, 50 F. 3rd at 1519).  In a case involving the attempted reconstruction of allegedly missing insurance contracts, one would expect an expert to review all of the available documentary evidence,

speak to any knowledgeable witnesses, and/or review any potentially relevant depositions.  Here, Mr. Hughes did none of these things.

At the start of his formal engagement in this case, Mr. Hughes asked counsel for Montello to provide him with "everything he had."  Coffey Aff., Ex. 1 (Hughes Dep., 11).  As Mr. Hughes explained:

> I would prefer not to have a non-insurance person edit the documentation that I'm going to use to try to develop a – an opinion regarding missing policies.  Because what I've found is that sometimes they omit things that would be important to me, but they're not important to them because they don't understand it.  So I just typically say, let me have – you know, I'll ask them, what kind of volume do you have . . . well, send me everything.

Coffey Aff., Ex. 1 (Hughes Dep., 12).  Notwithstanding Mr. Hughes' request for "everything" Montello had relating to the alleged Continental policies, Mr. Hughes rendered his opinions without any opportunity to review various documents he now concedes could be relevant.  For example, Mr. Hughes relies extensively on handwritten notes prepared in 2002 by Montello's former president, Ken Campbell.  Coffey Aff., Ex. 2 (Hughes Rpt., 7, 14).  In particular, he relies on these 2002 notes for his opinion about the limits of the alleged Continental policies.  *Id.*  However, prior to issuing his report Mr. Hughes was not given, and did not review, a 1991 version of similar notes that indicates "no limits shown" with respect to the alleged Continental policies – despite the fact that Mr. Hughes considers the 1991 document relevant to his opinions:

> Q:   Is this document relevant to the coverage – relevant to the question of what coverages might have existed?
>
> A:   Yes, it is.
>
> Q:   So this is a document that you would like to have been shown back at the time?
> A:   Sure.
>
> Q:   Do you have any understanding as to why you weren't shown it?

A:      No, I don't.

Q:      The first time you saw it was last night [after Mr. Hughes' report was filed and the night before his deposition]?

A:      Yes.

Coffey Aff., Ex. 1 (Hughes Dep., 133).  Because Mr. Hughes had not been shown the 1991 handwritten notes prior to preparing his report, he was not able to consider discrepancies between the 1991 notes (which showed no policy limits for any CNA policies) and the 2002 notes (which showed *estimated* policy limits for purported CNA policies).  In fact, when shown the two documents during his deposition, Mr. Hughes did not even recognize the discrepancies between the two documents until they were pointed out to him.  Again, Mr. Hughes' testimony makes the case:

Q:      And what are the assumptions that you would make based on [the 1991 handwritten notes]?

A:      Well, it's apparently a handwritten recap of insurance coverage similar to [the 2002 handwritten notes], except in this case it's dated December 27th, 1991.  And I have had a chance to compare the information contained on this new document [the 1991 notes], regarding CNA, Houston General, and Canal policies side by side and they appear to be identical.

Q:      What –

A:      Side by side with the document, [the 2002 handwritten notes].

Q:      You think the information on [the 1991 handwritten notes] is identical with the information on [the 2002 handwritten notes]?

A:      Well, I'm sorry.  What I mean is that they information that – that is the same, that is to say – let me get the other one.  Let me put it this way: I didn't find any information on [the 1991 handwritten notes] that refuted any of the information that's contained on [the 2002 handwritten notes].

Q:      Okay.  Now, [the 1991 notes], which [were] prepared in 1991, as far as the reference to CNA, indicate no limits shown, correct?

A:      That's right. . . . That's what they say – that's what it says.

Q:      Right.  It says, parenthetical, "no limits shown," correct?

A:      Right.  I don't know what they were looking at.

Q:      Okay.  Do you have any understanding as to what was learned between 1991, when this was created, and 2002, when [the 2002 notes] were created?

A:      No, I don't.

Q:      You don't know what the person looked at between then?

A:      No, I don't.

Q:      You don't know what information was available to you?

A:      No.

Q:      You don't know whether both documents were based simply on personal recollection?

A:      No, I don't.

Q:      Or maybe one was based on personal recollection and one was based on something else?

A:      No, I don't.

Q:      *You have no idea.*

A:      *That's right.*

Coffey Aff., Ex. 1 (Hughes Dep., 130 – 132) (emphasis added).

In his report, Mr. Hughes states that he viewed the 2002 handwritten notes referenced above as reliable, in part, because "the information contained in the document is consistent with Montello's answers to interrogatories in asbestos cases since 1986."  Coffey Aff., Ex. 2 (Hughes Rpt., 7). However, Mr. Hughes later conceded that he never reviewed any interrogatory responses filed by Montello since 1986:

Q:      Have you actually looked at any interrogatory answers that Montello has filed in any case?

A:      I have not.

14

> Q:    Okay.   So you're just relying on Mr. Johnson's statement that this handwritten document is consistent with this?
>
> A:    *Well, I'm just repeating what Mr. Johnson has said.*
>
> Q:    *And did you do anything at all to confirm the accuracy of what Mr. Johnson said?*
>
> A:    *No.*

Coffey Aff., Ex 1 (Hughes Dep., 120).  In fact, interrogatory responses Montello filed since 1986 are *not* consistent with the 2002 handwritten notes Mr. Hughes relied on.  Coffey Aff., Ex. 6 (Montello Interrogatory Response attaching insurance schedule showing *no limits* for alleged Continental policies and noting Montello "is not in a position to testify regarding the truth or veracity of this information").  Mr. Hughes' willingness to "just repeat[] what Mr. Johnson said" without doing anything to confirm the accuracy of what he was told is fatal to his opinions.  *Lyman v. St. Jude Med. S.C., Inc.*, 580 F. Supp. 2d 719, 726 (E.D. Wis. 2008) (excluding expert testimony where expert failed to verify the reliability of data given to him by counsel).

Mr. Hughes also rendered his opinions without obtaining copies of insurance policies "surrounding" the alleged Continental policies, despite his statement to the contrary and his position that such policies informed his opinions.  In his report, Mr. Hughes explains:

> The presence of a consistent pattern in the terms of policies of insurance forming an insurance program can often be the basis for developing opinions regarding the terms of one or more of those policies.  In this case, there is both excess liability policies purchased both before and after the terms of the allegedly missing policies that are the subject of this report.

Coffey Aff., Ex. 2 (Hughes Rpt., 6).  Mr. Hughes also noted that his opinions were supported by "related policies, such as those 'above' and 'below' the missing policy, [and] those issued before and after the missing policy."  *Id.*, 5.  However, Mr. Hughes admitted in his deposition that insurance policies "surrounding" the alleged Continental policies were unavailable to him:

Q:      . . . talking just about the Continental coverage, you don't have any preceding coverage, correct?  That you were able to look at?

A:      Right

Q:      And you don't have any underlying coverage that you were able to look at?

A:      Right.

Q:      And you don't have any excess coverage that you were able to look at?

A:      Right.

Q:      And you never looked – it may or may not exist, but you never looked at the subsequent coverage?

A:      The subsequent coverage?

Q:      The following year.

A:      That's right. . . .

Q:      So just to be clear.  The statement on Page 6 of the report that says, "In this case, there is both primary and secondary evidence of Montello insurance buying practices, including excess liabilities policies purchased both before and after the terms of the allegedly missing policies that are the subject of this report," *that statement is not correct as to Continental?*

A:      *That's right.*

Coffey Aff., Ex. 1 (Hughes Dep., 96 – 98) (emphasis added).  Mr. Hughes' willingness to render

opinions without looking at this "surrounding policy" information is particularly improper because

Mr. Hughes requested this information (to the extent it exists), but Montello's counsel refused to

provide it.  The testimony on this point is unambiguous and startling:

Q:      Were you asked at all to look at any coverage issued by Travelers, for instance?

A:      No.  As a matter of fact, I asked if I could look at the Travelers policies, and I was told that I could not.

* * *

16

Q:      You didn't make any effort to reconstruct [certain allegedly missing
        Travelers policies]?

A:      Well, that's not exactly correct because I asked for evidence because *I would
        have liked to have seen what the Traveler's policy said, but I was told that
        was not available. So I did make an effort, but my efforts were thwarted.
        Let's put it that way.*

Coffey Aff., Ex. 1 (Hughes Dep., 83 – 84, 188.)[5]  *See also* Hughes Dep., 69 (Mr. Hughes did not

review any deposition transcripts and could not recall whether he asked for any deposition

transcripts); and 110 (Mr. Hughes has "not actually spoken with anybody who was involved in

placing the Continental coverage" alleged here).

The methodology Mr. Hughes employed here – *i.e.*, (a) rendering opinions without looking at

relevant information, including information he had specifically requested; (b) rendering opinions

with "no idea" as to the bases of inconsistent documents; (c) rendering opinions without requesting

or reviewing potentially relevant deposition transcripts or discovery responses, and (d) rendering

opinions without speaking with potentially knowledgeable witnesses – is not sufficiently rigorous

and is inconsistent with the requirements of the Federal Rules.  Therefore, the Court should strike

Mr. Hughes' opinions and bar his testimony.

---

[5]      After Mr. Hughes' deposition, and after the close of Phase I discovery, information allegedly
regarding alleged Travelers policies was produced to Continental and provided to Mr. Hughes.
Coffey Aff., Ex. 4.  This information was previously requested by both Mr. Hughes and Continental,
and Montello has not fully explained the timing of its production.  More importantly, Montello
cannot supplement Mr. Hughes' report at this time.  *Cohlmia v. Ardent Health Services*, LLC, 254
F.R.D. 426, 433 (N.D. Okla. 2008) (Rule 26(e) does not permit "a second bite at the apple – an
opportunity to correct fatal defects in the reports they have submitted"); *Palmer v. Asarco*, 2007 WL
2254343 at *3 (N.D. Okla.) ("A supplemental expert report that states additional opinions or
rationales or seeks to 'strengthen' or 'deepen' opinions expressed in the original expert report
exceeds the bounds of permissible supplementation and is subject to exclusion under Rule
37(c)(1)").

### 3. Mr. Hughes' Report Includes Statements Of Fact, Not Opinions, That Are Demonstrably Incorrect

The methodology Mr. Hughes employed is also undercut by the number of statements in his report that Mr. Hughes concedes are incorrect.  Most significantly, Mr. Hughes was incorrect about the limits of liability of an insurance policy immediately following the alleged Continental excess policies, *even though the limits of the succeeding policy represented the "principal foundation" for Mr. Hughes' opinion as to the limits of liability of the alleged Continental policies.*  Once again, Mr. Hughes' deposition testimony is unambiguous and forecloses any reliance on his opinions:

Q:    Now, the next sentence you have here on Page 14 [of your report], it says, "The umbrella policies following the CNA policy years '74 to '81 had annual limits of $2 million."  Do you see that?

A:    Yes.

Q:    What's the significance of that?

A:    That goes back to the pattern and practice which indicates that they were buying $2 million a year, which is a pretty good indicator as to the kind of coverages that they would have purchased during that relevant period of time.

Q:    Do you think this fact that's stated here, the umbrella policies – 14 – the umbrella policies following the CNA policy years 12/1/74 to 3/1/81 had annual limits of $2 million, *is that a significant fact?*

A:    *I think it was, yes.*

Q:    Okay.  Is that consistent with the handwritten notes?

A:    Yes.

Q:    It is?

A:    Yes.

Q:    Okay.  So, for instance, starting at 12/1/74, the umbrella limits were $2 million?

A:    So are you asking me if it was consistent with this handwritten –

Q:      Right.

A:      Oh, okay. Sorry. I mis – misunderstood. Well, I don't think this document – I don't think this document lists the 12/1/74.

Q:      You don't think the handwritten document –

A:      I don't think it –

Q:      – Page 36, 37, lists the 12/1/74 coverage?

A:      Oh, here it is. At the top of the page there's an entry that I never did quite figure out, which lists a Travelers policy which says "Settlement" beside it. And it lists a 12/1/74 to 12/1/75 umbrella and it lists $3 million. *I was never ever to – ever allowed to see that particular Traveler's umbrella.*

Q:      Okay. So your statement here anyway, on Page 14, that says the umbrella policies following the CNA policy years had annual limits of $2 million, is that statement correct or incorrect?

A:      Well, it's certainly correct for the years from '78 to '81.

Q:      Okay. But what about '74 to – what about the immediately following policy year of '74 to '75?

A:      Well, it appears right now that the indication that we have is on the handwritten document, is that the limits were – the Traveler's policy – were three million.

Q:      Okay. So the statement in your report is wrong?

A:      I don't know that it's wrong because I don't know that that $3 million that's listed for the Traveler's policy here (indicating) is a Travelers' limit or whether that had something to do with a settlement that was made with the Traveler's. *I just don't know.*

                                              * * *

A:      . . . The – I thought it was quite clear in my report that *the principal foundation for my belief that it would be $2 million a year is the consistency with which they purchased $2 million a year during that particular period of time as – when we don't have the '74 to '75 information, apparently. What we do have is the '75 to '78 information for the [H]ome policy, which was indeed a $2 million limit. . . .*

Q:     *Okay. But I'm saying if it turns out that the Traveler's policy was a $3 million policy in the '74 to '75 year, then you don't have a consistent approach?*

A:     *That's right.*

Q:     You would have, according to your opinion, two million in the '68 to '74 period, then 3 million from '74 to '75 then back to two, then back to three?

A:     Well, back to two, but the back to three was quite a few years down the road.

Q:     Right.

A:     Yeah, which is not all that inconsistent.  *But yes, I agree with you that it's very seldom what you see, one year you have two million, the next year you have three, and then the next year you have two.*

Q:     *So the overall program that you're describing is something that you would say was very seldom seen?  If the Traveler's policy was $3 million.*

A:     Well, that's not what I'm describing.  *But if you want me to presume that that was the program, I would say yes, that was very seldom seen.*

Q:     And that would be an unusual program?

A:     In my opinion, it would, yes.

Q:     And not what you would expect to see?

A:     Correct.

Coffey Aff., Ex. 1 (Hughes Dep., 161 – 168).  In fact, the handwritten notes (which Mr. Hughes was otherwise comfortable relying upon) and the limited Travelers information Montello produced *after* Mr. Hughes' deposition, both indicate that Mr. Hughes was wrong about the limits of the policy issued immediately after the alleged Continental policies.  Coffey Aff., Ex. 3 (handwritten notes), 4 (late-produced Travelers document).

This is not simply a question of Mr. Hughes being sloppy.  Rather, the issue goes to the heart of Mr. Hughes' methodology.  Mr. Hughes testified:

A:    That goes back to the pattern and practice which indicates that they were buying $2 million a year, which is a pretty good indicator as to the kind of coverages that they would have purchased during that relevant period of time.

Q:    Do you think this fact that's stated here, the umbrella policies – 14 – the umbrella policies following the CNA policy years 12/1/74 to 3/1/81 had annual limits of $2 million, *is that a significant fact?*

A:    *I think it was, yes.*

* * *

A:    . . . The – I thought it was quite clear in my report that *the principal foundation for my belief that it would be $2 million a year is the consistency with which they purchased $2 million a year during that particular period of time as – when we don't have the '74 to '75 information, apparently.  What we do have is the '75 to '78 information for the [H]ome policy, which was indeed a $2 million limit. . . .*

Coffey Aff., Ex. 1 (Hughes Dep., 162, 165 – 166).  In fact, the "pattern and practice" that was the "principal foundation" underlying Mr. Hughes' opinion – *i.e.,* that Montello consistently bought $2 million in umbrella insurance from 1974 to 1981 – does not exist.  Coffey Aff., Ex. 3 (handwritten notes), 4 (late-produced Travelers document).  Montello's actual "pattern and practice" in the 1970s was not the consistent approach Mr. Hughes imagined, but an "unusual" approach that was "not what you would expect to see."  Yet Mr. Hughes apparently stands by the opinion he reached on the basis of a mistaken assumption or understanding.  Mr. Hughes' methods are plainly flawed if one of his most critical opinions does not change even after the "principal foundation" for that opinion turns out not to be true.[6]

---

6    Other examples of inaccuracies in Mr. Hughes' report include the statement that Mr. Hughes reviewed policies before and after the alleged Continental policies, and Mr. Hughes' statement that Montello's corporate witness relied on a 2002 document "since 1986."  Coffey Aff., Ex. 1 (Hughes Dep., 135 – 136) ("Q: . . . that's not correct with respect to Continental, correct? A: That's correct."); (Hughes Dep., 119) (". . . that should have been taken out, that's not correct, because the document itself wasn't even prepared until 2002").

Moreover, it is well settled that an expert's assumption of facts contrary to the actual evidence eviscerates the expert's opinions. *See Elcock v. Kmart Corp.*, 233 F. 3d 734, 756 (3rd Cir. 2000) (reversing district court's admission of expert economic damages testimony relying on empirical assumptions unsupported by the record); *Quinones-Pacheco v. American Airlines, Inc.*, 979 F. 2d 1, 6 (1st Cir. 1992) (affirming district court's exclusion of expert economic damages testimony "predicated on an assumption not supported by the record"). Here, Mr. Hughes' report states an understanding or assumption that "[t]he umbrella policies following the CNA policy years (12/1/74 to 3/1/81) had annual limits of $2 million." Coffey Aff., Ex. 2 (Hughes Rpt., 14). The very documents on which Mr. Hughes relies state otherwise. Coffey Aff., Ex. 3 (handwritten notes). Mr. Hughes' opinions are contrary to the documents he cites, demonstrate a complete lack of understanding of the actual facts, are not based on any investigation, and can do nothing to assist this Court. Therefore, Mr. Hughes' opinions should not be admitted.

### 4.     Mr. Hughes' Opinions Improperly Rely On Hearsay

While F.R.E. 702 generally permits an expert witness to rely on hearsay and third-party observations, "the Court must still ensure the 'expert' testimony is relevant and would be of assistance to the jury. Expert testimony based solely on hearsay and third-party observations that are adequately comprehensible to lay people would be improper to admit under Rule 702." *Combs, supra,* at *3. Here, Mr. Hughes relies far too much on hearsay, and double hearsay, to permit the Court to consider his testimony. (Mr. Hughes' excessive reliance on hearsay is discussed at length in Continental's Motion for Summary Judgment and Integrated Brief in Support at pp. 6 –10. *See* Doc. No. 108, filed contemporaneously with this Motion. That discussion is incorporated herein.).

5.      **Other Courts Have Excluded Mr. Hughes' Testimony In Insurance Coverage Litigation**

Other courts that have had occasion to consider the admissibility of Mr. Hughes' opinions on insurance coverage issues have determined that his reports and/or affidavits are not admissible. *See, e.g., North American Specialty Ins. Co. v. Myers*, 111 F. 3d 1273, 1280 – 81 (6th Cir. 1997) (affirming trial court finding that Hughes report "was attempting to decide a legal question which only courts could decide," and therefore inadmissible under Fed.R.Evid. 702); *Plantation Pipeline Co. v. Continental Cas. Co.*, 2008 WL 4737163 at *7 (N.D. Ga. 2008); *Green Textile Associates, Inc. v. Federal Ins. Co.*, 2006 WL 1677184 at *4 (D.S.C. 2006) (Hughes affidavit not considered by court on duty to defend issue); *Olympic Pipeline Co. v. Pacific Employers Ins. Co.*, Cause No. 01-2-16599-2 (King County Superior Court), Memorandum Ruling on Summary Judgment at 14 (Hughes testimony "invades the province of the Court to declare a matter of law").[7]  This Court should likewise find that Mr. Hughes' proposed opinions and testimony would not assist in the resolution of this case and, as such, should not be permitted.

III.     **CONCLUSION**

The Court's gatekeeper function requires an assessment of the reasoning and methodology of Mr. Hughes' opinions to determine whether that methodology is both scientifically valid and applicable to the actual facts of this case.  Here, it is clear that Mr. Hughes' factual basis, data, principles, and methods are not credible and are not grounded in facts, knowledge, or experience. Mr. Hughes' opinions were reached as a result of:  (1) "serendipity"; (2) a presumed "pattern and practice" that does not actually exist; (3) a "principal foundation" that is contradicted by the documents on which Mr. Hughes relies; (4) requests for documents or information that were

---

7       A copy of the *Olympic Pipeline* decision is attached as Exhibit 9 to the Coffey Affidavit.

"thwarted" and (5) excessive and, therefore, unreliable hearsay and double hearsay.  Such opinions cannot possibly inform or assist the Court.   The Court should reject these opinions, strike Mr. Hughes' report, and not permit him to testify.

WHEREFORE, for all of the reasons set forth above, Continental respectfully submits that this Court should grant Continental's Motion to Strike the Report of Robert Hughes and Bar the Testimony of Robert Hughes.

October 17, 2011                           Respectfully submitted,


                                          s/Patrick M. Ryan
                                          Patrick M. Ryan, OBA#7864
                                          Paula M. Jantzen, OBA#20464
                                          RYAN WHALEY COLDIRON SHANDY PLLC
                                          900 Robinson Renaissance
                                          119 North Robinson
                                          Oklahoma City, OK  73102
                                          Telephone:  405.239.6040
                                          Facsimile:  405.239.6766
                                          E-mail:  pryan@ryanwhaley.com
                                          E-mail:  pjantzen@ryanwhaley.com

                                                    - and -

                                          William M. Cohn (*pro hac vice*)
                                          Brian C. Coffey (*pro hac vice*)
                                          COHN BAUGHMAN & MARTIN
                                          333 West Wacker Drive, Suite 900
                                          Chicago, Illinois 606006
                                          Telephone: 312-753-6606
                                          Facsimile: 312-753-6601
                                          E-mail: william.cohn@mclolaw.com
                                          E-mail: brian.coffey@mclolaw.com

                                          ATTORNEYS FOR THIRD-PARTY
                                          DEFENDANT CONTINENTAL CASUALTY
                                          COMPANY, improperly identified as
                                          "CONTINENTAL CASUALTY CO., d/b/a CNA
                                          COMMERCIAL INSURANCE COMPANY d/b/a
                                          CNA INSURANCE COMPANIES"

## CERTIFICATE OF SERVICE

I hereby certify that on October 17, 2011, I electronically transmitted the attached document to the Clerk of the Court using the ECF System for filing.  Based on the records currently on file, the Clerk of the Court will transmit a Notice of Electronic Filing to the following ECF registrants:

James E. Green, Jr. - jgreen@cwlaw.com
Jed W. Isbell - jisbell@cwlaw.com
Richard E. Rush - rer@trc-law.com
William J. Rogers - wjr@trc-law.com
Andrew S. Hartman - andrew@andrewshartman.com
Jack C. Moore - jack.moore@andrewshartman.com
Molly J. Mrowka - molly.mrowka@andrewshartman.com
Michael L. Carr - hm@holdenlitigation.com
Reagan L. Madison - hm@HoldenLitigation.com
Roger N. Butler, Jr. - rbutler@secresthill.com
Charles F. Morrissey - cmorrissey@karballaw.com
Wayne S. Karbal - wkarbal@karballaw.com
Linda G. Kaufmann - lgk@jchlaw.com
Rodney L. Cook - rlc@jctokc.com
Don M. Vaught - dmv@jchlaw.com
Jason T. Seay - JasonSeay@HoldenLitigation.com
Jed W. Isbell - jisbell@cwlaw.com
Richard C. Ford - fordr@crowedunlevy.com

and by U.S. Mail, first-class, postage prepaid, to:

Robert D Moseley, Jr.
Smith Moore Leatherwood LLP
300 E. McBee Avenue, Suite 500
Greenville, SC  29601

s/Patrick M. Ryan
PATRICK M. RYAN