IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| CANAL INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | |
| | ) | |
| v. | ) | Case No. 10-CV-411-JHP-TLW |
| | ) | |
| MONTELLO, INC. | ) | |
| | ) | |
| Defendant/Third-Party | ) | |
| Plaintiff/Counter-Claimant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HARTFORD FINANCIAL SERVICES | ) | |
| GROUP, INC., CONTINENTAL | ) | |
| CASUALTY COMPANY, HOUSTON | ) | |
| GENERAL INSURANCE COMPANY, | ) | |
| NATIONAL INDEMNITY COMPANY, | ) | |
| SCOTTSDALE INSURANCE | ) | |
| COMPANY, & TWIN CITY FIRE | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| Third-Party Defendants. | ) | |

## OPINION & ORDER

Before the Court are Third-Party Defendant Continental Casualty Company's Motion to

Strike the Report of Robert Hughes and to Bar the Testimony of Robert Hughes (Motion to Strike

I),[1] Defendant Montello, Inc.'s Response Brief in Opposition to Continental Casualty Company's

Motion to Strike the Report of Robert Hughes and to Bar the Testimony of Robert Hughes

(Response I),[2] Continental Casualty Company's Reply Memorandum in Support of its Motion to

---

[1]Docket No. 109.

[2]Docket No. 114.

1

Strike the Report of Robert Hughes and to Bar the Testimony of Robert Hughes (Reply I),[3] Third-Party Defendant Continental Casualty Company's Motion to Strike the Untimely and Revisionist Affidavit of Robert Hughes (Motion to Strike II),[4] Defendant Montello, Inc.'s Response in Opposition to Coninental Casualty Company's Motion to Strike the Affidavit of Robert Hughes (Dated 10/17/11) (Response II),[5] and Continental Casualty Company's Reply Memorandum in Support of its Motion  to Strike the Untimely and Revisionist Affidavit of Robert Hughes (Reply II).[6]

Also before the Court are Third Party Defendant Continental Casualty Company's Motion for Summary Judgment Against Defendant Montello, Inc.,[7] Defendant Montello, Inc's Motion for Partial Summary Judgment Regarding the Existence of Umbrella Insurance Issued by Continental Casualty Company in Favor of Montello, Inc.,[8] Defendant Montello, Inc.'s Response and Brief in Opposition to Continental Casualty Company's Motion for Summary Judgment,[9] Third-Party Defendant Continental Casualty Company's Memorandum in Opposition to Montello's Motion for Partial Summary Judgment,[10] Continental Casualty Company's Reply Memorandum in Support of

---

[3]Docket No. 122.

[4]Docket No. 116.

[5]Docket No. 125.

[6]Docket No. 126.

[7]Docket No. 108.

[8]Docket No. 110.

[9]Docket No. 115.

[10]Docket No. 117.

its Motion for Summary Judgment,[11] and Defendant Montello, Inc.'s Reply Brief in Support of Motion for Partial Summary Judgment Regarding the Existence of Umbrella Insurance Issued by Continental Casualty Company.[12]

For the reasons set forth below, Third-Party Defendant Continental Casualty Company's Motion to Strike the Report of Robert Hughes and to Bar the Testimony of Robert Hughes[13] and Third-Party Defendant Continental Casualty Company's Motion to Strike the Untimely and Revisionist Affidavit of Robert Hughes[14] are **GRANTED**. Further, Third Party Defendant Continental Casualty Company's Motion for Summary Judgment Against Defendant Montello, Inc. is **GRANTED**.[15] Defendant Montello, Inc.'s Motion for Partial Summary Judgment Regarding the Existence of Umbrella Insurance Issued by Continental Casualty Company in Favor of Montello, Inc. is **DENIED**.[16]

## **BACKGROUND**

### A. Undisputed Factual Background[17]

This case originated as a declaratory judgment action by Plaintiff/Counter-Defendant

---

[11]Docket No. 123.

[12]Docket No. 124.

[13]Docket No. 109.

[14]Docket No. 116.

[15]Docket No. 108.

[16]Docket No. 110.

[17]The following facts are either not specifically controverted by Plaintiffs in accordance with Local Civil Rule 56.1(c) or are described in the light most favorable to the non-moving party. Immaterial facts are omitted.

Canal Insurance Company (Canal) against Defendant/Counter-Claimant/Third-Party Plaintiff Montello, Inc. (Montello) on June 25, 2010.[18] Montello responded by filing (1) an Answer to Canal's Complaint,[19] (2) a counterclaim against Canal for declaratory judgment and breach of contract ,[20] and (3) a third-party complaint against a number of third-party defendants.[21]

Montello "was a distributor of products used in the oil-drilling industry."[22] One product distributed by Montello for a period of time was "a drilling mud additive that was asbestos."[23] Montello has now "been sued by many individuals who were allegedly exposed to asbestos through Montello's products."[24] The parties refer to these numerous lawsuits brought by individuals against Montello as the "underlying litigation."[25] The underlying litigation has prompted Montello to seek liability coverage from the group of insurers involved in this case, most of whom are alleged to have insured Montello during the time period  it distributed products containing asbestos.[26] In essence, this case is one in which the parties are seeking a declaratory judgment regarding which of them, if any, must bear the cost of the expansive asbestos litigation in which Montello must defend itself.

---

[18] Docket No. 2.

[19]Docket No. 20.

[20]Docket No. 21.

[21]Docket No. 22.

[22]Montello's Answer to Canal's Complaint at 2, Docket No. 20.

[23]*See id.*

[24]*See id.*

[25]*See, e.g., id.*

[26]*See* Third-Party Complaint at 3-4, 8, Docket No. 22; Counterclaim at 2, Docket No. 21.

## B. Relevant Procedural History

In order to manage this cumbersome litigation, the Court has divided it into two phases.[27] In the first phase of the litigation, the Court set out to resolve both the Rule 12 motions of Third-Party Defendants National Indemnity Company and Hartford Financial Services Group, Incorporated and any dispositive motions regarding the existence, terms, and conditions of any insurance policies allegedly issued by Third-Party Defendant Continental Casualty Company (Continental).[28] The Court has previously ruled on the Rule 12 Motions of Defendants National Indemnity Company and Hartford Financial Services Group, Incorporated, therefore the Court can conclude Phase I by ruling on the pending summary judgment motions filed by Montello and Continental.[29] However, before the Court can reach the parties' motions for summary judgment, it must determine the admissibility of two reports by and the testimony of Montello's proffered expert, Robert Hughes.

## DISCUSSION

## A. Motion to Strike Reports/Exclude Testimony of Montello's Expert Robert Hughes

All of the motions at issue involve Montello's claims for insurance coverage under two "excess umbrella liability" insurance policies alleged to have been issued by Continental to Montello.[30] Montello concedes that it does not have copies of the alleged Continental policies, but

---

[27]*See* Order, Docket No. 105.

[28]*Id.* The pleadings and exhibits also refer to  "CNA Insurance Companies" or "CNA." CNA is a larger corporate entity under which Continental was doing business at the time the lost policies were allegedly issued.

[29]*See* Docket No. 105; *See also* Opinion and Order, Docket No. 101; Opinion and Order, Docket No. 103.

[30] Motion to Strike I at 1, Docket No. 109. The terms "umbrella policy" "excess liability policy," and "excess umbrella liability policy" appear to be used interchangeably throughout the pleadings. For the sake of consistency, the Court will refer to the alleged policies as "umbrella

maintains that the existence, terms, and conditions of these alleged policies can nevertheless be established through secondary evidence.[31] The two contested reports by Robert Hughes, a purported expert in the reconstruction of missing insurance policies, are major components of Montello's secondary evidence. Continental argues that "Hughes' opinions (a) lack any basis in reliable facts or data, (b) are not the product of sound reasoning and methodology, and (c) amount to little more than speculation and conjecture."[32] Continental further argues that Hughes' second report, issued on October 17, 2011, is both revisionist and untimely, as it fundamentally changes the opinions of the first report and was not made available to Continental until after the summary judgment deadline for Phase I.[33]

Although the Court recognizes Continental's Rule 26(a) argument with regard to timeliness of Hughes' second report, issues regarding the admissibility of Hughes' opinions are more clearly resolved by determining the overall admissibility of Hughes' proposed testimony, which will likely encompass the findings contained in both reports.[34]  In making the admissibility determination, Federal Rule of Evidence 702 imposes upon the  Court an obligation to "ensure that any and all

policies."

[31] Response I at 1, Docket No. 114.

[32] Motion to Strike I at 1, Docket No. 109.

[33] Motion to Strike II at 3, Docket No. 116.

[34]The Tenth Circuit has characterized exclusion for procedural reasons pursuant to Rule 26(a) as an "extreme" remedy. *See Gillum v. U.S.*, 309 Fed.Appx. 267, 270 (10th Cir.2009). As the overall action is stayed, any prejudice suffered by Continental resulting from the Court's admitting the tardy report could easily be resolved by a round of supplemental briefing to the existing motions for summary judgment without impacting the trial schedule. As such Rule 26(a) exclusion would be improper under the test set out in *Woodworker's Supply, Incorporated v. Principal Mutual Life Insurance Company,* 170 F.3d 985, 993 (10th Cir.1999) (holding factors to consider include prejudice and ability to cure).

scientific testimony or evidence admitted is not only relevant, but reliable."[35]

This obligation is often referred to as the "gatekeeper" function and requires the judge to assess the reasoning and methodology underlying the expert's opinion and to determine whether it is both scientifically valid and applicable to a particular set of facts.[36] The Supreme Court has made clear that "where [expert] testimony's factual basis, data, principles, methods, or their application are called sufficiently into question . . . the trial judge must determine whether the testimony has a 'reliable basis in the knowledge and experience of [the relevant] discipline.'"[37]

1. Qualifications

In performing its gatekeeper function, the Court must initially determine whether the proffered expert is qualified to offer an opinion on the pertinent issues of the case.[38] A qualified expert possesses the necessary knowledge, skill, experience, training, or education relevant to the facts at issue.[39]  Here, Montello proffers Hughes as an expert in the reconstruction of missing insurance policies, therefore Hughes' experience related to insurance industry policies and procedures in general, as well as with the insurance policies specifically at issue, are of primary importance in assessing whether or not he is qualified to testify as to the contents of the missing policies.

---

[35]*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

[36]*Id.* at 592-93.

[37]*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (*quoting Daubert*, 509 U.S. at 592).

[38]*Ralston v. Smith & Nephew Richards Inc.,* 275 F.3d 965, 969 (10th Cir.2001).

[39]*Id.*

Mr. Hughes' *curriculum vitae* is voluminous, demonstrating over fifty years experience in the insurance industry, including dozens of speaking engagements and publications on insurance topics.[40] It also includes four pages listing various court and deposition testimony, and another seven pages detailing his experience offering Federal Rule of Civil Procedure 26(a)(2) expert reports and testimony.[41] Further, Hughes' work in reconstructing lost policies has been held admissible by various courts.[42] This body of work demonstrates quite clearly that Hughes possesses  knowledge, skill, experience, training, and education related to the general policies and procedures of the insurance industry.

Despite this broad base of insurance industry knowledge, Hughes' experience with the specific issues germane to alleged Continental policies is somewhat suspect. For instance, at his September 28, 2011 deposition, Hughes testified that he could not recall ever placing a Continental umbrella policy with an insured, that he had reviewed only four or five exemplar Continental umbrella policies in preparation for his report, and that he had never seen a Continental policy that had been actually issued in Oklahoma.[43]

As Hughes is purporting to reconstruct the exact terms and conditions of the missing policies based in large part on his knowledge of the insurance industry during the time in which the policies were allegedly issued, his lack of experience with the forms specific to Continental is particularly troubling. However, the Court believes this issue bears largely on the reliability of the methods used

---

[40]*See* CV of Robert Hughes at 22-24, Docket No. 108-3.

[41]*Id.* at 29-35.

[42]*See, e.g., PSI Energy, Inc. v. Home Ins. Co.*, 801 N.E.2d 705, 717-721 (Ind. App.2004).

[43]*See* Hughes Deposition at 81:4-6; 32:3-21; 136:11-137:1, Docket No. 128-1.

by Hughes in reaching his instant conclusions and is therefore better addressed in the Court's analysis of Hughes' methodology. Consequently, in light of Hughes' extensive experience in the insurance industry, the Court finds him generally qualified to render an expert opinion as to the existence, terms, and conditions of the missing policies.

2. Reliability

Finding Hughes generally qualified, the Court turns to the two-pronged inquiry regarding the reliability and relevance of the proffered testimony.[44] The reliability prong is determined by considering "whether the reasoning or methodology underlying the testimony is scientifically valid."[45] Although absolute certainty is not required, expert opinions "must be based on facts which enable [the expert] to express a reasonably accurate conclusion as opposed to conjecture or speculation," facts that "sufficiently satisfy Rule 702's reliability requirements."[46] In its review, it is critical that the district court examine whether the proffered evidence is genuinely scientific, rather

than "unscientific speculation offered by a genuine scientist."[47]

Throughout the reliability analysis, the district court should generally focus on an expert's methodology rather than the conclusions it generates.[48] However, an expert's conclusions are not

---

[44]*Bitler v. A.O. Smith Corp.,* 400 F.3d 1227, 1232 (10th Cir.2004).

[45]*Daubert,* 509 U.S. 579, 592-93, 113 S.Ct 2786, 125 L.Ed.2d 469 (1993).

[46]*Gomez v. Martin Marietta Corp.,* 50 F.3d 1511, 1519 (10th Cir.1995) (*quotation omitted*); *Truck Ins. Exch. v. Magnetek, Inc.,* 360 F.3d 1206, 1210 (10th Cir.2004).

[47]*Mitchell v. Gencorp Inc.,* 165 F.3d 778, 783(10th Cir.1999) (*quoting Rosen v. Ciba-Geigy Corp.,* 78 F.3d 316, 318 (7th Cir.1996)).

[48]*Daubert,* 509 U.S. at 595.

immune from scrutiny: "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."[49] Under *Daubert*, "any step that renders the analysis unreliable . . . renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology."[50]

Hughes' first report, submitted on September 20, 2011, concluded that the missing policies at issue, for the period beginning December 1, 1968 and ending in 1971, and the period beginning December 1, 1971, and ending in 1974, (1) were issued by a CNA Company, more likely than not Continental, (2) that the policies included policy limits of $2,000,000 per occurrence and $2,000,000 in the aggregate, and (3) that the wording of those policies was identical or substantially similar to that of the exemplar policy at Exhibit E.[51] Hughes issued a second report on October 17, 2011 after he received information concerning subsequent policies issued by Travelers Insurance Companies. In this report, Hughes alters his original conclusions by (1) including an attachment point in the underlying Travelers Comprehensive General Liability (CGL) policy indicating the amount of loss necessary to trigger the alleged umbrella coverage and (2) altering his conclusion regarding the purported policy limits.[52]

*a. Existence of Continental Policies*

---

[49]*General Elec. Co. v. Joiner*, 522 U.S. 136, 146,  118 S.Ct. 512,139 L.Ed.2d 508 (1997) ("[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert" ).

[50]*Mitchell,* 165 F.3d at 782 (*quoting* In re *Paoli RR. Yard PCB Litigation*, 35 F.3d 717, 745 (3d Cir.1994)).

[51]*See* Expert Report of Robert N. Hughes at 11, 15, Docket No. 108-3.

[52]*See* Affidavit of Expert Opinion of Robert N. Hughes at 12, 15-16, Docket No. 111.

In reaching his conclusions about the existence of the Continental policies, Hughes' initial report relied upon (1) ledger cards regarding Montello from the records of insurance broker Harlan Agents and Brokers Incorporated that indicated policy number RDU-8911677 for the December 1, 1969 to December 1, 1971 period written by company "62", (2) a letter from a CNA claims specialist that states company code "62" indicates the policy was issued by a CNA company, (3) a 1986 letter from Fred Daniel and Sons Insurance referencing Montello policies issued by CNA numbered RDU-8911677 and RDU-8058960, and (4) a citation from the Recognition Guide to Policy Prefixes and Form Prefixes indicating that the RDU prefix was used by Continental during the 1960's and 70's.[53] In addition to this secondary evidence, Hughes attests that he has reviewed hundreds of umbrella policies and has never found any companies other than CNA companies using the prefix "RDU."[54] Hughes' second report did not alter his original conclusions as to the existence of the Continental policies.

The admissibility of much of the evidence relied upon by Hughes is in dispute.[55]  However, for the purpose of evaluating Hughes' methodology, the Court accepts, *arguendo*, the admissibility of those records. These records inform Hughes' conclusion that the policies existed and were issued by a CNA company, and Hughes' conclusion based on this evidence requires no significant analytical leap.  Further, unarguably admissible evidence like the impartial Recognition Guide and Hughes' knowledge of the industry support his conclusion that the CNA company issuing the policies was likely Continental.   Based on this otherwise reliable evidence, Hughes' opinion

[53]*Id.*  at 11-14.

[54]*Id.* at 13.

[55]*See* Continental's Memorandum in Opposition to Montello's Motion for Partial Summary Judgment at 10, 14, Docket No. 117.

confirming the existence of the policies and his opinion that they were issued by Continental rises above mere speculation and conjecture and into the realm reliability. Consequently, although the Court draws no conclusions as to the actual existence or issuer of the missing policies, the Court finds the methodology employed by Hughes in coming to the conclusions noted above to be generally reliable.

### b. Attachment Point of Umbrella Policies and the Policy Limits

In determining the policy limits for his initial report, Hughes utilized a handwritten "Recap of Insurance Coverages" list prepared by Kenneth Campbell, a former president of Montello, as well as "pattern of practice" evidence including policies issued after the missing policy.[56] Again, the admissibility of the underlying evidence is disputed, but the Court assumes, *arguendo*, that the material is admissible for the sole purpose of assessing Hughes' methodology.[57] Although not cited in the report, Hughes also relied on his knowledge concerning common industry buying practices during the time period.[58] While compiling the initial report, Hughes lacked information concerning the Travelers CGL policies underlying the alleged umbrella policies at issue and the Travelers umbrella policies that followed the alleged Continental policies.[59]

Based on the above information, Hughes could not render an opinion as to the attachment

---

[56]*See* Affidavit of Expert Opinion of Robert N. Hughes at 6, 14, Docket No. 111; Hughes Deposition at 92:22-94:20, Docket No. 128-1.

[57]*See* Continental's Memorandum in Opposition to Montello's Motion for Partial Summary Judgment at 10, Docket No. 117.

[58]*See* Hughes Deposition at 94:8-20, Docket No. 128-1.

[59]*Id.* at 188:1-14.

point of the alleged umbrella policies in his initial report.[60] Hughes did, however, state that it was his professional opinion that both the alleged 1968-71 policy and the alleged 1971-74 policy limits were $2,000,000 each year, each occurrence combined bodily injury and property damage and $2,000,000 in the aggregate annually.[61]

According to his first report, Hughes' initial attempt to reconstruct the alleged policy limits used only the information contained in the Campbell recap and the umbrella coverage limits from the 1981 Canal policies, policies issued a decade after the Continental policies at issue.[62] In coming to his initial conclusion, Hughes used a method of review he refers to as "a sandwich" where he reviews the policy issued prior to and the policy issued after the lost policy in order to draw conclusions as to the lost policy.[63] If Hughes' ultimate opinion was based only upon these initial supporting facts, without information on the subsequent and underlying policies, the Court would consider Hughes' methodology to be lacking sufficient factual foundation and find his conclusion as to the limits of the alleged policies far too speculative to be reliable.

However, on October 4, 2011, Hughes received information on the Travelers policies, and on October 17, 2011, the summary judgment motion deadline, Hughes issued a second report that incorporated this new information.[64] Based on the new information provided in the Travelers polices,

---

[60]*See id.* at 177:6-18.

[61]Expert Report of Robert N. Hughes at 15-16, Docket No. 108-3.

[62]Expert Report of Robert N. Hughes at 14-15, Docket No. 108-3.

[63]Hughes Deposition at 92:22-93:4, Docket No. 128-1.

[64]Response II at 2-3, Docket No. 125. Defendant Continental similarly objects to the admissibility of the Travelers documents, citing they have not been properly authenticated. *See* Continental's Memorandum in Opposition to Montello's Motion for Partial Summary Judgment at 15, Docket No. 117. These documents have subsequently been authenticated by the deposition

Hughes was able to conclude that the attachment point in the underlying coverage that would trigger both alleged umbrella policies was $300,000.[65] Hughes also altered his opinion concerning the limits of the alleged policies. Hughes still believed the alleged 1971-74 policy limits were $2,000,000 each year, each occurrence combined bodily injury and property damage and $2,000,000 in the aggregate annually.[66] However, he now believed that the liability for policy years 1968-1970 had limits of $1,000,000 each year, each occurrence combined bodily injury and property damage and $1,000,000 in the aggregate annually, increasing to $2,000,000 each year for 1970-71.[67]

Hughes' second report both supplements his factual support and alters his conclusions accordingly. Hughes' second report considers premiums and payment dates from the missing policies and the limits of the subsequent Travelers policies, in conjunction with his personal knowledge of market conditions during the time period.[68] The increased factual support, especially the inclusion of the Travelers policies, provides a factual foundation for Hughes' "sandwich" method.

Similarly, until he received the Travelers' policy information, Hughes could not even conjecture as to the attachment point of the alleged umbrella policies.[69] However, after receiving the information regarding the underlying CGL, Hughes was able to accurately assess the policy limits

---

testimony of Glen Frisby. *See* Montello's Reply Brief in Support of Motion for Partial Summary Judgment at 9-10, Docket 124.

[65]Affidavit of Expert Opinion of Robert N. Hughes at 16-17, Docket No. 111.

[66]*Id.*

[67]*Id.* at 16.

[68]Affidavit of Expert Opinion of Robert N. Hughes at 15, Docket No. 111.

[69]*See* Hughes Deposition at 177:6-178:14.

14

of the Travelers CGL, and come to a conclusion as to the attachment point for the alleged umbrella policies.[70] This conclusion  was further supported by Hughes' comparison of the CGL policies to the coverage recap provided by Kenneth Campbell.[71] Again the Court draws no conclusion as to the policy limits or attachment points of the missing policies, but, based on the stronger factual foundation of the second report, the Court finds the methodology underlying Hughes' conclusions as to both the policy limits and the attachment points of the missing umbrella policy forms to be generally reliable.

*c. The Policy Form*s

Despite all the secondary evidence cited above regarding the existence of the missing policies, the actual policy forms containing all of the terms and conditions of the policies at issue remain missing.[72] Hughes admits that the RDU prefixes supplied and corresponding policy numbers cannot be used to identify the wording of a particular form policy.[73] Lacking any clear indication of the form used, Hughes attempts to identify the terms and conditions of the policies at issue by offering exemplar form policies used during the period. Although umbrella liability policies are not standardized by rating bureau promulgation like CGLs, Hughes posits that umbrella policies have become standardized through usage.[74] However, despite Hughes' substantial knowledge of and experience in the insurance industry, he has never reviewed a Continental umbrella policy actually

---

[70]Affidavit of Expert Opinion of Robert N. Hughes at 13-15, Docket No. 111.

[71]*Id.*

[72]*Id.* at 7.

[73]*See* Hughes Deposition at 99:17-19, Docket No. 128-1.

[74]Affidavit of Expert Opinion of Robert N. Hughes at 4, Docket No. 111.

issued in Oklahoma.[75] With these facts in mind, the Court reviews the reliability Hughes' investigation and conclusions concerning the terms and conditions of the missing policies.

In both reports, Hughes ultimately concludes that the policy form used for the alleged policies at issue was the same or substantially similar to the G-40240 series form, as attached as Exhibit E to his initial report.[76] However, Hughes admits that the policies could have also used the exemplar form attached as Exhibit D.[77] In preparing his reports, Hughes examined "approximately" four exemplar Continental  umbrella policies from his company's library.[78] Of those four form policies, two substantially conformed with the policy form attached as Exhibit D to his initial report, and two substantially conformed with the policy form attached as Exhibit E.[79] None of the forms from the library were issued in Oklahoma.[80]

The actual form policy attached as Exhibit E was provided by Montello representative Andy Hartman in a packet of materials from the Oklahoma Department of Insurance (ODI).[81] Prior to issuing his report, Hughes initially concluded that the form used in the missing policies was likely the same or substantially similar to that of Exhibit D because in practice he had seen more policies

---

[75]*See* Hughes Deposition at 136:12-22.

[76]Expert Report of Robert N. Hughes at 14, Docket No. 108-3; Affidavit of Expert Opinion of Robert N. Hughes at 12, Docket No. 111.

[77]*Id.*

[78]*Id.* 32:10-24.

[79]*Id.* at 39:7-12.

[80]*Id.* at 32:25-33:23; 35:3-12.

[81]*Id.*  at 50:23-51:5.

issued that were similar to Exhibit D.[82] After receiving the ODI materials that included the exemplar form policy attached as Exhibit E, Hughes altered his opinion and concluded that Exhibit E was the more likely policy form.[83]

This revised conclusion was based largely on the fact that the policy form attached as Exhibit E had been submitted for approval to the ODI.[84] Before seeing these materials, Hughes believed that, at the time the policies were allegedly issued, Oklahoma was a non-approval state.[85] Upon discovery that the Exhibit E form had been submitted to the ODI for approval and after seeing the letter to the ODI from Continental regarding that form, Hughes then concluded the policy form used was more likely a derivation of Exhibit E.[86] However, Hughes does not state that the form policy at Exhibit E had actually been approved by the ODI or that the form policy at Exhibit D lacked approval by the ODI.[87] Additionally, Hughes concedes that the form used could have been more like the one at Exhibit D or could have been another form altogether.[88] What Hughes does state, and the evidence bears out, is that the two exemplar policy forms he examined are materially different in their terms

---

[82]*Id.* at 37:12-38:2.

[83]*Id.* at 38:14-22.

[84]*Id.*

[85]*Id.*

[86]*Id.* at 41:5-18; 43:5-13.

[87]*Id.* at 42:9-20 ("[B]ut to the extent you have an RDU, that does not necessarily mean that it is similar to Exhibit D or similar to Exhibit E. It could be either;" "Q: There may be others; you just don't know– A: Right."). *See also* 41:20-42:20; 47:14-19; Expert Report of Robert N. Hughes at 14, Docket No. 108-3; Affidavit of Expert Opinion of Robert N. Hughes at 12, Docket No. 111.

[88]*Id.*

and conditions.[89] Furthermore, the possibility of discrepancies in policy language goes far beyond the unknown number of different forms. Hughes also admits that the missing policies could have been modified with any number of other, unknown endorsements that could add or limit coverage.[90]

For example, Hughes' first report concludes that the missing policy for the 1971-74 period would have included the "Defense Coverage Endorsement G-40247-A."[91] Hughes bases this conclusion on a reference to the attached G-40247-A endorsement in the Continental letter seeking ODI approval of policy form G-40240.[92] Despite finding this endorsement to be applicable, Hughes admits he does not have a copy of Endorsement G-40247-A, but claims it is "similar" to Endorsement 40452-A attached to his report.[93]

Although Mr. Hughes is impressively qualified in the field of insurance, the factual basis for his conclusion that Exhibit E represents the terms and conditions of the alleged policies at issue is suspect. Hughes was essentially only able to review two exemplar umbrella policy forms from Continental, those represented in Exhibits D and E. The only clear reasoning offered for why Hughes ultimately selected the form represented by Exhibit E is that it had been submitted for approval to the ODI.[94] Hughes makes this assertion despite the fact he cannot say whether or not the

---

[89]Hughes Deposition at 35:23-25 ("Q: There's no question that Exhibit D is different from Exhibit E? A: Correct"); 39:6-7. *See also* Exhibit D at 39-41, Docket No. 108-3; Exhibit E at 48, 50-52, Docket No. 108-3. *See also infra* pp. 20-21.

[90]*Id.* at 137:13-19; 185:16-186:6.

[91]Expert Report of Robert N. Hughes at 16, Docket No. 108-3.

[92]Hughes Deposition at 168:14-169:16, Docket No. 128-1.

[93]*Id.* at 169:11-170:2. *See also* Affidavit of Expert Opinion of Robert N. Hughes at 17, Docket No. 111.

[94]*Id.* at 43:7-12.

form in Exhibit E was actually approved by the ODI.[95]

Hughes also readily admits that the missing policies could have been written on the exemplar form in Exhibit D. Considering the basis of his opinion, there is a distinct possibility that Hughes might quickly change it were he to receive similar information regarding ODI approval for policy form represented by Exhibit D or for an altogether different exemplar policy. This malleability makes it readily apparent that Hughes lacks enough data to enable him to express a reliable conclusion as to the actual terms and conditions of the missing policies. The possibility that Hughes' opinion could potentially change throughout the trial and beyond as new evidence arises establishes that Hughes' opinion is, at best, speculative and therefore unreliable.

The fact that Hughes only reviewed two exemplar policy forms is also of concern to the Court. Because the number of umbrella policy forms used by Continental during the period is unknown, the Court cannot know how small a statistical sample the two forms examined by Hughes actually represent. However, the very fact that there may be other unexamined, approved policy forms with varying terms and conditions upon which the alleged policy may have been written diminishes the reliability of Hughes' methodology.

Hughes' opinions on the issue of endorsements cause the Court to further question the reliability of his methods. Endorsements are generally proven separately from the general terms of the policy, but, as stated by Hughes, endorsements can wholly alter the terms of a form policy.[96] Hughes has never placed a Continental policy in Oklahoma and none of the policy forms reviewed by Hughes was actually issued in Oklahoma, therefore Hughes has little basis to intelligently infer

---

[95]*Id.* at 158:2-8.

[96]*See* Hughes Deposition at 185:16-186:6, Docket No. 128-1.

as to what endorsements were typical to Oklahoma policies during the period in question.

Despite this lack of firsthand knowledge, Hughes alleges one endorsement is applicable, Endorsement G-40247-A.[97] This endorsement appears to be included by Hughes solely because of information contained in the ODI application for approval.[98] Further, Hughes makes this conclusion despite not having a copy of the actual endorsement for reference.[99] Although the issue of endorsements is distinct from Hughes' task in proving the basic terms of the umbrella policy, the logical lapses in his methodology here reflect on his analysis of the policy terms as a whole.

Finally, the reliability of Hughes' conclusion that the form used was the same or substantially similar to Exhibit E is frustrated by his "either/or" addendum citing Exhibit D because those two forms contain materially different terms and conditions. For example, Exhibit E defers to the terms and definitions of the underlying CGL should that underlying policy insure per "accident" rather than per "occurrence."[100] In contrast, the policy form at Exhibit D pays per "occurrence" as strictly defined by that policy form.[101] The matter of whether the coverage allegedly provided is based on a "per accident" or "per occurrence" basis can certainly be material as to the amount of coverage provided under the instant facts.[102]

---

[97]*Id.*

[98]*Id.*

[99]*Id.*

[100]*See* Exhibit E at 52, ¶1, Docket No. 108-3.

[101]*See* Exhibit D at 38, Docket No. 108-3.

[102]*See, e.g. Century Indem. Co. v. Aero-Motive Co.,* 254 F.Supp.2d 670, 687 (W.D.Mich.2003) ("However, coverage in the Sun Oil policy is triggered by an 'occurrence,' whereas coverage in the policy worksheet is triggered by an 'accident'").

In another example, Exhibit E's notice of suit provision is notably more detailed than that of Exhibit D. In analyzing the coverage of the missing policies, the notice provision is material, and clearly could not be the one from either Exhibit E or Exhibit D. Apportionment of liability in this case may very well hinge on the intricacies of the required notice to the insurer. Consequently, when Hughes hedges his bets by stating that it could possibly be either form, he undercuts the reliability of his conclusion that it was probably the same or substantially similar to Exhibit E. The fact that there may be multiple other unknown policy forms with materially different notice provisions that evaded Hughes' review only compounds the unreliability of his initial assessment.

In a final example, the Court notes that the exemplar policy at Exhibit E contains a settlement provision that is notably absent from Exhibit D.[103] This provision allows the insurer to settle the case "for the amount stated in item 4 of the declarations page."[104] Considering this provision delegates the power to end this litigation as to the instant parties, whether or not such a provision is applicable could be material to the outcome of this case. By qualifying his conclusion, Hughes essentially finds that this important provision could be in or out, with no evidence to support an opinion either way. This is the epitome of unreliability as addressed by *Daubert* and its progeny.

In coming to his conclusion, Hughes reviewed only two exemplar policies, neither of which were from Oklahoma. Further, Hughes cannot state with any certainty whether the reviewed forms were ever actually approved for use in Oklahoma, and he concedes there may be other forms, with wholly different terms, which may have been used in this instance. It is this lack of evidence and lack of personal knowledge regarding the breadth of policy forms relevant to this case that destroy

---

[103]*See* Exhibit E at 49, ¶9, Docket no. 108-3.

[104]*Id.*

the reliability of Hughes' otherwise reliable methods. This unreliability is clearly demonstrated by Hughes' ultimately uncertain conclusion.

Consequently, the Court finds that Hughes' methodology in determining the terms and conditions of the alleged policies is not based on facts which would enable him to express a reasonably accurate conclusion as required by *Daubert* and its progeny. This dearth of facts creates an unacceptable analytical gap between the evidence considered by Hughes and his ultimate conclusion, connected only by the *ipse dixit* of Hughes himself.

In making these findings, the Court recognizes that "[a]s a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination."[105] However, the *Daubert* standard requires that the methodology used in rendering an expert opinion be scientifically sound and "based on actual knowledge, not subjective belief or unsupported speculation."[106]

In this case, Hughes lacks both the evidence and actual knowledge of Continental policies necessary to form an opinion that rises above bald speculation. The logical leaps made by Hughes in forming his opinion of the policy terms render that opinion akin to "the unscientific speculation of a genuine scientist."[107] Consequently, both the methodology and conclusions of Robert Hughes regarding the alleged terms and conditions of the missing policies are unreliable. The reports of Mr. Hughes are rightfully stricken and any testimony on this issue is properly excluded from jury consideration.

---

[105]*Larson v. Kempker*, 414 F.3d 936, 941 (8th Cir.2005) (*internal quotation omitted*).

[106]*Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir.2003) (*quoting Daubert*, 509 U.S. at 590) (*internal quotations omitted*).

[107] *Cf., id.*

3. Relevance

In addition to examining the reliability of an expert's methods, The *Daubert* calculus also requires the Court to assess the relevance of proffered expert testimony. The relevance prong specifically requires that the proposed testimony be sufficiently "relevant to the task at hand."[108] This is determined by considering whether the reasoning or methodology can be properly applied to the facts at issue.[109] The proffered testimony must  "assist the trier of fact to understand the evidence or to determine a fact in issue." [110] Ultimately, under the relevance prong, the district court must "ensure that the proposed expert testimony logically advances a material aspect of the case."[111]

Although the Court finds Hughes' testimony generally reliable with regard to the existence of the purported policies, the attachment point of those policies, and the policies' limits, the unreliability of his conclusions regarding the specific terms of the policies impairs the relevance of his testimony to these proceedings. Without reliable evidence demonstrating the terms of the policies, Hughes' opinions as to the policies' existence, and even opinions on when the policies were triggered and the total value of the policies, are of little value in determining the ultimate issue of whether coverage was available in this instance under the specific terms and conditions of the purported policies. As such, the reliable sections of Hughes' reports do not logically advance the material aspect of this phase of the litigation and are therefore irrelevant and rightfully stricken and they will not be considered by the Court in determining summary judgment.

---

[108]*Daubert,* 509 U.S. at 592-93, 597. *See also Kumho Tire Co., v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct 1167, 143 L.Ed.2d 238 (1999).

[109]*Id.*

[110]*Gilson v. Sirmons*, 520 F.3d 1196, 1241 (10thCir.2008) (*internal citation omitted*).

[111]*Norris v. Baxter Healthcare Corp*., 397 F.3d 878, 884, n.2 (10thCir.2005).

**B. Party Motions for Summary Judgment**

Both parties seek summary judgment on the issue of coverage under the missing policies. Montello seeks summary judgment on seven issues related to the existence, policy limits, and terms of the missing policies.[112] Third-Party Defendant Continental also seeks summary judgment as to each of these issues, arguing specifically that: (1) Montello cannot show the existence of any purported policies through admissible evidence, (2) Montello cannot show the policy limits or attachment points of any purported policies through admissible evidence, and (3) Montello cannot demonstrate the material terms of any purported policies.[113]

1. Summary Judgement Standard

Federal Rule of Civil Procedure 56(c) provides the standard courts must use when determining whether summary judgment is proper.  According to the rule, summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."[114] A material fact is one that is essential to disposition of a claim, and a genuine issue is present when the trier of fact could resolve it in favor of either party.[115]

A party moving for summary judgment need not support its motion with evidence disproving the nonmoving party's claim, but must only point out to the district court that there is an absence

---

[112]Montello's Motion for Partial Summary Judgment at 1-2, Docket No. 110.

[113]Continental's Motion for Summary Judgment at 27, Docket No. 108.

[114]*See Jennings v. Badget*, 2010 OK 7, ¶¶ 4-5, 230 P.3d 861, 864; Fed. R. Civ. P. 56(c).

[115]*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

24

of evidence to support the nonmoving party's case.[116] The ultimate question is whether the party

bearing the burden of proof has presented a jury question as to each element of its case.[117] Montello,

as the party bearing the burden, must present more than a mere scintilla of evidence in support of

its position; it must present evidence on which the Court could reasonably find in its favor.[118]

The parties agree as to the applicability of Oklahoma law.[119] Generally, when determining

issues of law in a diversity action, this Court has an obligation to apply Oklahoma law as announced

by the highest court of the state.[120] In the absence of an authoritative pronouncement, federal courts,

sitting in diversity, must predict how Oklahoma's highest court would rule, following  "any

intermediate state court decision unless other authority convinces [this Court] that the state supreme

court would decide otherwise."[121] The Court's analysis may also be informed by the policies

underlying the applicable legal doctrines, the  doctrinal trends indicated by these policies, and the

decisions of other courts.[122]

Finally, under Oklahoma law, insurance contracts are generally interpreted as a matter of

---

[116]*Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986).

[117] *Id.* at 322.

[118]*Anderson*, 477 U.S. at 252.

[119]*See, e.g.,* Continental's Motion for Summary Judgment at 7, Docket No. 108; Montello's Motion for Partial Summary Judgment at 11, Docket No. 110. *See also Houston Gen. Ins. Co. v. Am. Fence Co., Inc.*, 115 F.3d 805, 806 ("The interpretation of an insurance contract is governed by state law and, sitting in diversity, we look to the law of the forum state").

[120]*Comm'r v. Estate of Bosch*, 387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886 (1967).

[121]*Daitom, Inc. v. Pennwalt Corp.*, 741 F.2d 1569, 1574 (10th Cir.1984).

[122]*Id.*

law.[123] If the facts upon which an insured relies to recover under a policy are admitted, then it is for the Court to determine whether those facts come within the terms of the policy.[124] Such a determination is appropriately made on summary judgment.[125]

## 2. Standard of Proof for Lost Policies

Both parties agree that Oklahoma law is relatively silent on the subject of lost policies.[126] However, it is clear that under Oklahoma law, a party seeking to enforce an insurance contract bears the burden of proving the existence of coverage.[127] The question of coverage goes beyond proof of the existence of a policy, on summary judgment an insured must necessarily offer evidence that raises a material question of fact as to whether coverage was available under the specific terms and conditions of a purported policy.[128]

As the actual policy is missing, the exact language defining the contours of the alleged coverage is unavailable. Therefore, to meets its burden of proving coverage, Montello must find

---

[123]*BP Amer. Inc. v. State Auto & Cas. Ins. Co.*, 2005 OK 65, ¶ 6, 148 P.3d 832, 835.

[124]*Price v. Mid-Continent Cas. Co.*, 2002 OK CIV APP 16, ¶¶11, 41 P.3d 1019, 1022 (*quoting Goforth v. Franklin Life Insurance Company*, 202 Kan. 413, ¶1, 449 P.2d 477 (1969)).

[125]*Id.*

[126]*See* Continental's Motion for Summary Judgment at 7, Docket No. 108; Montello's Motion for Partial Summary Judgment at 11, Docket No. 110.

[127]*State Mut. Life Assur. Co. of America v. Hampton,* 1985 OK 19,  696 P.2d 1027, 1034 (holding trial court correctly found insured has burden of proving existence of insurance contract and coverage under policy) (*citing Metropolitan Life Ins. Co. v. Rosier*, 1941 OK 314, 117 P.2d 793, ("A fair analysis of the various expressions of this court upon the subject leads to the inevitable conclusion that the rights of the parties to an insurance contract are determinable solely by the provisions of the contract").

[128]*Hampton*, 697 P.2d at 1034 (holding trial court correctly found insured had burden of proving coverage under policy).

some other way to prove the coverage terms of the missing policy. Under Oklahoma's rules of evidence, secondary evidence can fill this role. Both the Oklahoma Evidence Code and the Federal Rules of Evidence permit, in certain instances, the use of secondary evidence to prove the contents of unavailable documents, ostensibly including lost insurance policy forms.[129] The pertinent statutory section reads:

> The original is not required, and a duplicate *or other evidence of the contents* of a record is admissible if:
>
> 1. All originals are lost or have been destroyed unless the proponent lost or destroyed them in bad faith[.][130]

However, as Oklahoma courts have not discussed secondary evidence as related to lost insurance policies, the Court looks to case law from other jurisdictions where this issue has arisen to give some indication of how Oklahoma courts might rule.  When looking to proposed secondary evidence, other courts have stated that "the Rules of Evidence do not establish a hierarchy of secondary evidence; anything that tends to demonstrate the writing's contents may constitute secondary evidence."[131] However, courts addressing this issue have generally held that an insured seeking to evidence coverage under a lost or missing insurance policy must offer proof of the policy terms defining coverage, not just the existence of a policy.[132] This comports with Oklahoma

---

[129]*See* 12 OKLA. STAT. TIT. §3004. *See also* Fed.R.Evid. 1004.

[130]*Id.* (*emphasis added*)

[131]*See, e.g.,U.S. v. McGaughey*, 977 F.2d 1067, 1072 (7th Cir.1992).

[132]*See, e.g., Glew v. Cigna Group Ins*., 590 F.Supp.2d 395, 413 (E.D.N.Y., Dec. 30, 2008) (*citing Bituminous Casualty Corp. v. Vacuum Tanks, Inc.,* 975 F.2d 1130, 1132 (5th Cir.1992)).

precedent requiring an insured to prove coverage under the terms of any given policy.[133] Consequently, in ruling on summary judgment the Court must determine whether the insured can raise a material question of fact as to both the existence of the missing policies and the existence of coverage under the terms and conditions of those purported policies.

3. Sufficiency of Montello's Evidence

      In this case there is no evidence of bad faith on the part of Montello, therefore the court may look to secondary evidence to prove the terms of the policies. As the Court has excluded Hughes' report, the Court looks to Montello's remaining secondary evidence to determine if it can raise a material question of fact as to the existence of coverage under the purported policies. Therefore, the preliminary inquiry is whether the proffered evidence is sufficient to raise a question of fact as to the material terms governing coverage in the lost policy. In its analysis, the Court finds cases from the Fifth and Sixth Circuits particularly instructive.

      The Sixth Circuit has recognized that proving the existence of coverage through secondary evidence is a particularly onerous task.[134] In *Harrow Products Incorporated v. Liberty Mutual Insurance Company*, the Sixth Circuit court reviewed a case involving multiple policies over a number of years, some of which were produced and some of which were missing. The evidence supporting the existence and terms of the missing policies essentially consisted of "a four-page, twelve-paragraph affidavit by a former employee."[135] In *Harrow*, the court had first reviewed

---

      [133]*Hampton*, 697 P.2d at 1034 (holding trial court correctly found insured had burden of proving coverage under policy).

      [134]*Harrow Products Incorporated v. Liberty Mutual Insurance Company*, 64 F.3d 1015, 1021 (6th Cir.1995).

      [135]*Id.*

coverage under the produced Liberty Mutual policies issued to Plaintiff Harrow.[136] Despite evidence of the terms of other policies between Liberty Mutual and Harrow, the *Harrow* court, applying Michigan law, found that Harrow had not presented sufficient evidence to defeat summary judgment as to the content of those policies that were missing.[137] In highlighting the importance of nuance and precision in determining coverage disputes, the *Harrow* court noted:

> Copies of insurance policies fill the volumes with page after page of finely printed documents, many in double columns. As in most insurance disputes, the parties are quibbling over individual paragraphs, single lines, and isolated phrases.[138]

The *Harrow* court ultimately stated that:

> [ ] no jury could find, absent sheer speculation, the scope of coverage, the relevant notice requirements, and all of the other aspects of the policy, on which coverage often hinges. Nor can Harrow rely on some contemporaneous version of the policy that it has secured from other parties, or from Appellees, absent some clear link, such as there being only one version of the policy, direct testimony linking the sample policy to the one issued, or solely cosmetic differences between versions. The very fact that there are different versions undermines Harrow's claim.[139]

The instant evidence suffers from the same infirmity as that in *Harrow*. Through the whole of its evidence, Montello may be able to demonstrate the existence of the missing policies and even some of the coverage terms, but the bulk of the conditions of coverage remain unknown and even unknowable. Despite Montello's proffer of allegedly exemplar policy forms, even the excluded testimony of Hughes offers no clear link between those exemplars and the alleged policy at issue. Further, the evidence indicates that the actual number of policy forms in use by Continental during

---

[136]*See id.* at 1019-20 (discussing specific clauses of other policies issued to Harrow by Liberty Mutual).

[137]*Id.* at 1021.

[138]*Id.*

[139]*Id.*

the period in question is unknown, and any number of varying forms could have been used to effect the alleged coverage.[140]

This Court's review of the two exemplars proffered by Montello and examined by Hughes demonstrates that the differences between policy documents is more than cosmetic.[141]  This problem is exacerbated by the fact that there is no way to know with any degree of certainty that the two exemplars comprise the only two policy forms in use by Continental during the disputed time frame. The likely existence of multiple policy forms with widely disparate terms and conditions defeats any possibility that Montello's proffer is sufficient to raise a material question of fact as to the terms and conditions of any missing policy allegedly issued by Continental.

Fifth Circuit precedent supports this position. In *Bituminous Casualty Corporation v. Vacuum Tanks, Incorporated*, the circuit court, applying Texas law, found that despite the production of policy numbers, dates of coverage, and coverage amounts, the insured did not raise a material question of fact as to coverage under the missing policies.[142] The secondary evidence of policy numbers, dates of coverage, and coverage amounts in *Bituminous* did not suffer from the admissibility challenges of the instant case, but even so, the circuit court reasoned that such secondary evidence was insufficient to defeat summary judgment absent proof of the actual terms of the policy.[143]

Here, admissibility concerns aside, Montello has offered evidence that, taken as true, would

---

[140]*See supra* note 87.

[141]*See supra* at pp. 20-21.

[142]*Bituminous*, 975 F.2d 1130, 1132-33 (5th Cir.1992).

[143]*Id.*

perhaps demonstrate the existence of the missing policies, the dates of coverage, coverage amounts, and the attachment points of the policies. What Montello cannot present, however, is anything beyond bald speculation as to the actual policy terms defining the alleged coverage. This is insufficient to meet Montello's burden of raising a question of material fact as to the existence of coverage under the lost policies, thus summary judgment in favor of Continental is appropriate.

## CONCLUSION

For the reasons set forth above, Third-Party Defendant Continental Casualty Company's Motion to Strike the Report of Robert Hughes and to Bar the Testimony of Robert Hughes[144] and Third-Party Defendant Continental Casualty Company's Motion to Strike the Untimely and Revisionist Affidavit of Robert Hughes[145] are **GRANTED**.

Furthermore, even assuming, *arguendo*, the admissibility of Montello's proffered evidence outside the Hughes reports, and taking as true all the information contained therein, Montello's claims against Continental must fail. Even if the Court found reliable, admissible evidence supporting the policies' existence, Montello has offered no reliable evidence of the policies' terms and conditions. Without such evidence, the Court is forced to speculate as to the scope of coverage, the relevant notice requirements, and all of the other precise, policy language upon which coverage generally hinges. Consequently, Montello has failed to offer sufficient evidence upon which this Court could reasonably find that Montello was covered under the missing policies, and summary judgment for Continental and against Montello as to the existence of coverage is appropriate.

As such, Third Party Defendant Continental Casualty Company's Motion  for Summary

---

[144]Docket No. 109.

[145]Docket No. 116.

Judgment Against Defendant Montello, Inc. is **GRANTED**.[146] Defendant Montello, Inc.'s Motion for Partial Summary Judgment Regarding the Existence of Umbrella Insurance Issued by Continental Casualty Company in Favor of Montello, Inc. is **DENIED**.[147]

James H. Payne
United States District Judge
Northern District of Oklahoma

---

[146]Docket No. 108.

[147]Docket No. 110.