**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

CANAL INSURANCE COMPANY,                )
                                        )
              Plaintiff,                )
                                        )
vs.                                     )
                                        )
MONTELLO, INC.,                         )
                                        )
              Defendant.                )          Case No. 10-CV-411-JHP-TLW
                                        )
THE HARTFORD FINANCIAL                  )
SERVICES GROUP, INC.;                   )
CONTINENTAL CASUALTY                    )
COMPANY; HOUSTON GENERAL                )
INSURANCE COMPANY; NATIONAL             )
INDEMNITY COMPANY;                      )
SCOTTSDALE INSURANCE                    )
COMPANY; and TWIN CITY FIRE             )
INSURANCE COMPANY                       )
                                        )
        Third-Party Defendants.         )

**OPINION AND ORDER**

Before the Court are the Joint Motion for Summary Judgment filed by Canal Insurance

Company ("Canal"), Houston General Insurance Company ("Houston General"), Scottsdale

Insurance Company ("Scottsdale"), and Twin City Fire Insurance Company ("Twin City"), [Doc.

No. 146], and the parties respective joinders therein, [Doc. Nos. 147, 149, 150, & 151].  Also

before the Court are Montello's Motion for Partial Summary Judgment, [Doc. No. 157];

Montello's Motion to Amend, [Doc. No. 176]; Montello's Motion to Clarify, [Doc. No. 176];

and Continental Casualty Company's ("Continental") Motion for Rule 54(b) Certification, [Doc.

No. 142].

# BACKGROUND

## A.  General Background

Montello was a distributor of products used in the oil-drilling industry, one of which was a drilling mud viscosifier that contained asbestos.  In subsequent years, Montello has been sued by many individuals who were allegedly exposed to asbestos through products distributed by Montello.[1]  The underlying litigation has prompted Montello to seek liability insurance coverage from the group of excess insurers, most of which provided excess and/or umbrella insurance coverage over Montello's now-insolvent primary insurer, The Home Insurance Company ("Home").  In short, the Court is "asked to declare a winner in a game of grammatical tug-of-war" between excess insurers and an insured regarding whether excess insurance policies "'drop down' in place of a policy issued by a now-insolvent primary insurer."  *Transco Exploration Co. v. Pacific Employers Insurance Co.,* 869 F.2d 862 (5th Cir. 1989).  During this phase of the litigation, the primary issue is whether any of these excess insurers have a present duty to "drop down" in place of the insolvent primary insurer and defend or indemnify Montello in the underlying asbestos litigation.

## B.  Relevant Procedural History

On June 25, 2010, Canal commenced the instant action seeking a seeking a declaratory judgment from this Court regarding the rights and liabilities under an insurance policy issued by Canal to Montello.  [Doc. No. 2].  Montello responded by filing a counterclaim against Canal for declaratory judgment and Breach of Contract, [Doc. No. 21], and a third-party complaint against Hartford Financial Services Group, INC. ("Hartford"), Continental, Houston General, Scottsdale, and Twin City, [Doc. No. 22].

---

[1] The parties refer to these numerous lawsuits brought by individuals against Montello as the "underlying litigation."

Due to the cumbersome nature of this litigation, the Court divided the litigation into multiple phases.  [Doc. No. 105].  In the first phase of the litigation, the Court set out to resolve both the Rule 12 motions of Third-Party Defendants National Indemnity Company and Hartford and any dispositive motions regarding the existence, terms, and conditions of any insurance policies allegedly issued by Continental.  All other issues were reserved for adjudication after the completion of the initial phase of the litigation.  After Phase I was complete, the parties appeared for a Status and Scheduling Conference, at which the Court set the parameters for Phase II of litigation.  Specifically, the Court limited Phase II of the litigation to determining three issues: (1) whether the insurers have a duty to "drop down" to assume the obligations of the insolvent primary insurer; (2) whether any other unique provisions contained in the individual policies bar coverage under the respective policies;[2] and (3) whether Continental was entitled to relief pursuant to Fed. R. Civ. P. 54(b).  The Court also set a briefing scheduling with regard to these issues.

In accordance with the briefing schedule, Continental filed a Motion for Rule 54(b) Certification on March 4, 2013, wherein it requested the Court enter an order "(1) directing entry of a final judgment in favor of Continental based upon the Court's October 15, 2012 *Opinion and Order* granting summary judgment to Continental" and "(2) determining that there is no just reason for delaying an appeal from such final judgment."  [Doc. No. 142, 1].  On April 2, 2013, Canal, Houston General, Scottsdale, and Twin City filed their Joint Motion for Summary Judgment, [Doc. No. 146], and, on April 9, 2013, the parties filed respective joinders in the Joint Motion for Summary Judgment, [Doc. Nos. 147, 149, 150, & 151].  Then, on May 7, 2013,

---

[2] The Court directed the parties to brief the first issue in a joint motion for summary judgment and subsequently file their joinders therein addressing both issues.  Further, the Court recognizes that resolution of one or both of these issues may be dispositive of one or more of the claims asserted.  As such, some of the motions pending before the Court may be regarded as *partial* motions for summary judgment.

Montello filed a Motion for Partial Summary Judgment, [Doc. No. 157].  Finally, on August 2, 2013, Montello filed a Motion to Amend and a Motion to Clarify, [Doc. No. 176].  These motions are now fully briefed and before the Court.

## C.  Undisputed Factual Background

Montello is an Oklahoma corporation with offices and principal place of business in Tulsa County, Oklahoma.  Montello is a distributor of products used in the oil drilling industry, including a drilling mud viscosifier that during certain years in the past contained asbestos. Montello was established in 1957 and began distributing asbestos containing products sometime after 1966.  Initially, Montello purchased its asbestos containing product from a company called Atlas Asbestos Company.  Thereafter, Montello purchased its asbestos viscosifier product (sometimes branded "Visbestos") in fifty pound, pre-packaged bags from Union Carbide Company ("Union Carbide").  On or before July 31, 1985, Montello ceased distribution of asbestos-containing products.

From its founding in 1957 until March 1, 1975, Montello purchased its primary general liability insurance policies from The Travelers Insurance Company and/or The Travelers Indemnity Company (collectively "Travelers") (hereinafter, the "Travelers Policies").  On March 1, 1975, Montello switched its primary general liability insurer from Travelers to Home.  From March 1, 1975 – March 1, 1978, Home issued primary general liability insurance policies to Montello with an annual combined single limit of $300,000.  From March 1, 1978 until March 1, 1984, Home issued primary general liability policies to Montello with an annual combined single limit of $500,000 per year.  Both the Travelers and the Home Policies included a duty to defend Montello with respect to the claims asserted in the underlying litigation.

In 2003, The Home Insurance Company became insolvent before paying its underlying limits, and, indeed, before any claims for bodily injury had been paid on Montello's behalf. When it became apparent that Home would not be able to fulfill its defense and indemnity obligations, Montello demanded that other insurers whose policies were excess over the respective Home Policies defend and indemnify Montello.

It is undisputed that all of the claims asserted against Montello in the Underlying Litigation have been paid on its behalf, either by Travelers or Union Carbide.  This is so because when Montello became aware of the possible long-term health effects of exposure to asbestos, it entered into a series of indemnity agreements with its supplier, Union Carbide, under which Union Carbide agreed to defend and indemnify Montello against claims arising out of Montello's distribution of Union Carbide's products.

## DISCUSSION

As a general rule, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue is genuine if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is material if it "might affect the outcome of the suit under the governing law."  *Id.*  In making this determination, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255. Thus, the inquiry for this Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.* at 251–52.

## A.  Insurance Policy Construction and Interpretation

As a threshold matter, the Court's exercises jurisdiction over this action pursuant to 28 U.S.C. § 1332 (diversity jurisdiction), and, consequently, Oklahoma law applies to the interpretation of the relevant policies.  *See Houston Gen. Ins. Co. v. Am. Fence Co., Inc.,* 115 F.3d 805, 806 (10th Cir. 1997) (applying Oklahoma insurance law).  The interpretation of an insurance policy is generally a question of law for the courts.  *Max True Plastering Co. v. U.S. Fid. & Guar. Co.*, 912 P.2d 861, 869 (Okla. 1996)*; see also VBF, Inc. v. Chubb Group of Ins. Cos.*, 263 F.3d 1226, 1231 (10th Cir. 2001).   Under Oklahoma law, insurance contracts are interpreted "in accordance with principles applicable to all contracts."  *Mansur v. PFL Life Ins. Co.*, 589 F.3d 1315, 1319 (10th Cir. 2009).  The contract is "construed according to the plain meaning of its language," and, if unambiguous, the court "interprets the contract as a matter of law." *Id.*

Courts should interpret an insurance policy in a manner that gives effect to the mutual intentions of the parties as they existed at the time of contracting and effectuates the purpose of the contract.  *Southern Hospitality, Inc. v. Zurich American Ins. Co.*, 393 F.3d 1137, 1139 (10th Cir. 2004); *Wynn v. Avemco Ins. Co.*, 963 P.2d 572, 575 (Okla. 1998); *see also* 15 OKLA. STAT. § 152 (2012).  Indeed, "[t]he construction of an insurance policy should be a natural and reasonable one, fairly constructed to effectuate its purposes, and viewed in light of common sense so as not to bring about an absurd result."  *Dodson v. St. Paul Fire & Marine Ins. Co.*, 812 P.2d 372, 376 (Okla. 2002).  A contract shall not be interpreted in a manner that leaves words without meaning and renders language superfluous.  *See Bituminous Casualty Corp. v. Cowen Constr., Inc.*, 55 P.3d 1030, 1033 n.15 (Okla. 2002) ("[t]he whole of a contract is to be taken . . .

so as to give effect to every part, if reasonably practicable") (quoting 15 Okla. Stat. § 157 (2012)).

"When an insurance contract is susceptible of two meanings ... words of inclusion are liberally construed in favor of the insured and words of exclusion strictly construed against the insurer." *Phillips v. Estate of Greenfield*, 859 P.2d 1101, 1104 (Okla. 1993). "I[t] is the expectations of the insured that control" when "the terms of the contract are unclear, or when the contract is susceptible to two reasonable interpretations." *Western World Ins. Co. v. Markel American Ins. Co.*, 677 F.3d 1266, 1271 (10th Cir. 2012); *accord Mansur,* 589 F.3d at 1319 (Because "[a]n insurance policy is considered a contract of adhesion in Oklahoma," if the contract is ambiguous, it is "construed in favor of the insured.").

A commercial general liability insurance policy "generally contains two basic duties—the duty to defend and the duty to indemnify its insured." *First Bank of Turley v. Fid. & Deposit Ins. Co. of Md.,* 928 P.2d 298, 302–03 (Okla. 1996). The insurer's duty to defend is broader than the duty to indemnify, and arises whenever the insurer "ascertains the presence of facts that give rise to *the potential of liability* under the policy." *Id.* at 303 (footnote omitted and emphasis original). "[T]here *need not be a probability of recovery.*" *Id.* at 303 n. 14 (emphasis original). "[T]he insurer's duty to defend its insured arises whenever the allegations in a complaint state a cause of action that gives rise to the *possibility of a recovery* under the policy." *Id.* (emphasis original). The insured bears the burden of proving that a loss triggers coverage under an insurance policy. *Pittman v. Blue Cross & Blue Shield of Okla.*, 217 F.3d 1291, 1298 (10th Cir. 2000). Courts should not "impose coverage where the policy clearly does not intend that a particular individual or risk should be covered." *BP Am., Inc. v. State Auto Prop. & Cas. Ins. Co.*, 148 P.2d 832, 835-36 (Okla. 2005).

**B.  Primary, Excess, and Umbrella Insurance**

There are three types of insurance contracts implicated in this case—primary, excess, and umbrella.  The difference between these three types of insurance contracts is relevant to the resolutions of the issues in the case.  For purposes of clarity, the Court outlines the general distinctions between these types of insurance below.

It is undisputed that the insurance contract between Montello and Home was a contract for primary insurance.

> *Primary insurance* provides immediate coverage for the insured upon the occurrence of a loss or the happening of an event which, under the terms of the policy, gives rise to immediate liability. In the context of liability insurance a primary insurer generally has the primary duty to defend and indemnify the insured unless specific language in the policy provides otherwise.

*U.S. Fid. & Guar. Co. v. Federated Rural Elec. Ins. Corp.*, 37 P.3d 828, 831 (Okla. 2001).

The remaining policies at issue in this litigation have been characterized as both excess and umbrella insurance policies.  First, an excess insurance policy is "one which by its terms provides coverage that is secondary to the primary coverage; there is usually no obligation to the insured until after the primary coverage limits have been exhausted."  *Id.*  Second, an umbrella policy has the same purpose as an excess policy—to protect the insured in the event of catastrophic loss in which liability exceeds the available primary coverage.  Unlike excess policies, however, umbrella policies often provide primary coverage for risks that the underlying policy does not cover.  15 COUCH ON INS. § 220:32 (collecting cases).  It is also possible for insurance policies to include both excess and umbrella insurance coverage.

**C.  "Drop Down Obligations"**

The issue of whether the Defendant Insurers have an obligation to "drop down" and provide insurance coverage to Montello even though Home, the underlying primary insurer, is now insolvent is common to all of the motions for summary judgment before the Court.  Under

the *Erie* doctrine, federal courts sitting in diversity must apply the substantive law of the state that would otherwise have jurisdiction over the claims at issue.  *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 427 (1996).  The issue of whether the attachment point of excess insurance policies is altered by the insolvency of the primary insurer, however, has never been directly addressed by Oklahoma courts.

In the absence of an authoritative pronouncement from the highest court, a federal court's task under the *Erie* doctrine is to predict how the state's highest court would rule if presented with the same case.  *See Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 666 (10th Cir. 2007).  The federal court "must follow the decisions of intermediate state courts in the absence of convincing evidence that the highest court of the state would decide differently."  *Stoner v. New York Life Ins. Co.*, 311 U.S. 464, 467 (1940).  To predict how the state's highest court would rule, the federal court "may seek guidance from decisions rendered by lower courts in the relevant state, appellate decisions in other states with similar legal principles, district court decisions interpreting the law of the state in question, and 'the general weight and trend of authority' in the relevant area of law."  *Wade*, 483 F.3d at 666 (citations and internal quotation marks omitted).  Indeed, if the forum state's highest court has not addressed an issue, the federal court should look to decisions from other jurisdictions and follow the "majority rule."  *Grantham & Mann, Inc., v. American Safety Prods., Inc.*, 831 F.2d 596, 608 (6th Cir. 1987).  Therefore, the Court must look to authority from other jurisdictions in order to ascertain the majority rule.

The Court has surveyed numerous decisions from other jurisdictions and consulted multiple secondary sources and finds "the majority of the courts that have confronted the issue hold that when a primary insurer becomes insolvent, the excess insurer is not required to 'drop down' to assume the primary insurer's coverage obligations."  Barry S. Ostrager & Thomas R.

Newman, Handbook on Insurance Coverage Disputes §§ 13.03, 13.12 at 875-78 and 900-07 (7th ed. 1994) (current through amendments); Insolvency of underlying insurers—The issue of "drop down", Allocation of Losses in Complex Insurance Coverage Claims § 9:2 (collecting cases); § 6:45; Excess insurer's duty to indemnify, 2 Insurance Claims and Disputes § 6:45 (6th ed.) ("[E]xcess policies will rarely "drop down" and pay a portion of a loss that a primary carrier would have paid had it not become insolvent.") (collecting cases). *See also Premcor USA, Inc. v. American Home Assurance Co.*, 400 F.3d 523 (7th Cir. 2005) (Illinois law) (no drop down); *Federal Ins. Co. v. Srivastava*, 2 F.3d 98, 102 (5th Cir. 1993) (Texas law) (no drop down); *New Process Bread Baking Co. v. Federal Ins. Co.*, 923 F.2d 62, 63 (7th Cir. 1991) (Illinois law) (same); *Radiator Specialty Co. v. First State Ins. Co.*, 651 F. Supp. 439, 441-44 (W.D. N.C. 1987) *aff'd*, 836 F.2d 193, 194 (4th Cir. 1987) (North Carolina law) (same); *Interco Inc. v. National Surety Corp.*, 900 F.2d 1264 (8th Cir. 1990) (Missouri law) (same); *Continental Marble & Granite v. Canal Ins. Co.*, 785 F.2d 1258(5th Cir. 1986) (Louisiana law) (same); *Mission National Ins. Co. v. Duke Transp. Co., Inc.*, 792 F.2d 550 (5th Cir. 1986) (Louisiana law) (same); *Zurich Ins. Co. v. Heil Co.*, 815 F.2d 1122, 1126 (7th Cir. 1987) (Wisconsin law) (same); *Molina v. United States Fire Ins. Co*., 574 F.2d 1176 (4th Cir. 1978) (West Virginia law) (same); *Guaranty Nat'l Ins. Co. v. Bayside Resort, Inc.*, 635 F.Supp. 1456 (D. V.I. 1986) (same); *Ware v. Carrom Health Care Prods., Inc.*, 727 F.Supp. 300, 305 (N.D. Miss. 1989) (Mississippi law) (same); *Highlands Ins. Co. v. Gerber Prods. Co*., 702 F.Supp. 109, 112 (D. Md. 1988) (Maryland law) (same); *Hudson Ins. Co. v. Gelman Sciences Inc.*, 706 F.Supp. 25, 26-27 (N.D. Ill. 1989)(Illinois law), *aff'd* 921 F.2d 92 (7th Cir. 1990) (same); *Alabama Ins. Guar. Ass'n v. Kinder-Care*, 551 So.2d 286, 288-89 (Ala. 1989) (Alabama law) (same); *Vickodil v. Lexington Insurance Co.*, 587 N.E.2d 777 (Mass. 1992) (Massachusetts law); *Donegal Mut. Ins. Co. v.*

Long, 528 Pa. 295, 297 (1991) (Pennsylvania law) (same); *U.S. Fire Ins. v. Capital Ford Truck Sales*, 355 S.E.2d 428, 432-33 (Ga. 1987) (Georgia law) (same); *Morbark Indus., Inc. v. Western Employers Ins. Co.*, 429 N.W.2d 213, 217 (Mich. Ct. App. 1988) (Michigan law) (same); *U.S. Fire Ins. Co. v. Coleman*, 754 S.W.2d 941, 942-945 (Mo. Ct. App. 1988) (Missouri law) (same); *Steyr-Daimler-Puch A.G. v. Allstate Ins.*, 151 A.D.2d 942 (N.Y.S. 1989) (New York law) (same).

The Court finds that, if confronted with the issue of an excess insurer's obligation when the underlying primary insurer becomes insolvent, the Oklahoma Supreme Court would not impose an obligation on the excess insurer to drop down and provide insurance coverage in the absence of language indicating the insurers intent to do so. Indeed, the Oklahoma Supreme Court has explained that excess insurers' obligations are not triggered "until after the primary coverage limits have been exhausted." *U.S. Fid. & Guar. Co.*, 37 P.3d at 831 (citing *Equity Mutual v. Spring Valley Wholesale Nursery, Inc.*, 747 P.2d 947 (Okla. 1987); *Insurance Company of North America v. American Economy Insurance Co.*, 746 F.Supp. 59 (W.D. Okla. 1990)). The Court further explained that requiring excess insurer's to provide coverage prior to the exhaustion of primary coverage limits would improperly "reallocat[e] risks that the parties had freely agreed to and had been compensated to assume." *Id.* at 833 (citing *Hartford Accident & Indemnity Co. v. Continental National American Ins. Co.*, 861 F.2d 1184 (9th Cir. 1988) (requiring excess insurer to participate may force payment although excess liability never attaches and despite explicit provisions of excess insurance policy; premiums are predicated on obligations assumed and equity cannot require insurer to provide coverage for which it was not paid); *Signal Companies Inc. v. Harbor Ins. Co.*, 612 P.2d 889 (Cal. 1980); 19 A.L.R. 4th 75 (no showing of compelling equitable principles justified imposing obligation in contravention of

policy provisions; requiring participation in costs would make excess insurer a co-insurer with coextensive duty to defend); *Texas Employers v. Underwriting Members*, 836 F.Supp. 398 (S.D. Tex. 1993) (to equitably apportion defense costs between primary and excess carriers would fly in the face of policy language and established case law; neither policy language nor evidence suggests insured or insurers reasonably expected excess carrier would participate beyond terms of the policy); *Shell Oil Co. v. Winterthur Swiss Ins. Co.*, 12 Cal. App. 4th 715 (1993) (gross disparity between primary and excess liability limits does not create equitable duty on the part of excess insurer to contribute to defense funds; any duty excess insurer might have had to pay defense funds did not depend on whether insured's claims were within excess insurance coverage where primary insurance had not been exhausted); *Colorado Farm Bureau Mutual Ins. Co. v. North American Reinsurance Corp.*, 802 P.2d 1196 (Colo. Ct. App. 1990) (defense costs incurred prior to exhaustion of primary policy limits are incurred solely under the primary policy); *United States Fire Ins. Co. v. Roberts and Schaefer Co.*, 683 P.2d 600 (Wash. App. 1984) (since primary insurer's duty encompasses claims against insured regardless of whether they are in excess of primary policy limits, excess insurer's duty to defend does not come into existence); *Occidental Fire & Casualty Co. v. Underwriters at Lloyd's, London*, 19 Ill.App.3d 265 (1974) (where primary insurer contracted to and did pay defense costs and excess insurer paid its share of judgment, parties had done precisely what they had been paid for and court could perceive no reason to redistribute the expenditures); *Fireman's Fund Ins. Co. v. Rairigh*, 59 Md. App. 305 (1984) (if position urged by primary insurer were true, excess insurers would be obligated to defend every case where claim exceeded policy limits regardless of amount of damages claimant could prove); *Continental Casualty v. Synalloy Corp.*, 667 F.Supp. 1523 (S.D. Ga. 1983) (where insured purchased one policy specifically as primary coverage and one as

excess coverage, equating the two companies' defense duties as a matter of law would reform the contracts)).   Further, the Oklahoma Supreme Court has also clearly held that "except where public policy concerns demand the imposition of coverage, insurers are not required to cover a loss for which no premium has been paid … ."   *BP Am., Inc.*, 148 P.3d at 837-38 (citing *Breakfield v. Oklahoma Farmers Union Mutual Ins. Co.*, 910 P.2d 991 (Okla. 1995); *Withrow v. Pickard*, 905 P.2d 800 (Okla. 1995); *Scott v. Cimarron Ins. Co., Inc.*, 774 P.2d 456 (Okla. 1989); *Stanton v. American Mutual Liability Ins. Co.*, 747 P.2d 945 (Okla. 1987)).

The Court recognizes, however, that these principles must be applied in light of principles of insurance contract interpretation.   Indeed, courts considering the so-called "drop down" issue adopt a case-by-case approach, analyzing the particular policy terms to determine the excess insurer's liability under the policy.   *Zurich Ins. Co.*, 815 F.2d at 1125; *see also Value City, Inc. v. Integrity Ins. Co.*, 508 N.E.2d 184, 186 (Ohio Ct. App. 1986) ("the ultimate issue … is whether the language of the excess insurance contract encompasses the risk of insolvency of the primary carrier").   This approach is consistent with Oklahoma law.   *Freightquote.com, Inc. v. Hartford Cas. Ins. Co.*, 397 F.3d 888, 896 (10th Cir. 2005) (applying Oklahoma law) ("Insurance coverage cases are contract cases—driven by the terms and conditions of the insurance policies themselves.").   Therefore, the Court examines each of the excess insurance policies below, applying and making reference to the aforementioned legal conclusions where appropriate. Further, when presented with conflicting authority, the Court will follow authority consistent with the majority view as outlined above.

**D.  Canal's Motion for Summary Judgment**

**1.  Canal Policies**

Montello was insured pursuant to the terms and conditions of Canal Policy No. XS000563 for the period March 1, 1981 - 1982, and Canal Policy No. XS007988 and a renewed policy in substantially the same form for the period March 1, 1983 through March 1, 1985 (the "Canal Policies").  Each of the Canal Policies provided $3 Million per year of first-layer excess coverage over the limits of the policies set forth in the Schedule of Underlying Policies. The Schedule of Underlying Policies identifies the primary carrier as Home, whose immediately underlying primary insurance policy had an annual combined single limit of $500,000.00.  In addition to excess coverage, the Canal policies provided umbrella coverage over a $10,000.00 retained limit for liabilities arising out of occurrences covered by the Canal Policies and for which the underlying primary policy is "inapplicable to the occurrence."  [Doc. No. 147, Exs. A & B].  The Declaration page of the Canal Policy in effect from March 1, 1981 to March 1, 1982 reflects a premium of $3,000.00 for $3 Million Dollars in coverage limits.  The Declaration page of the Canal Policy in effect from March 1, 1983 to March 1, 1985 reflects an annual premium of $1,350.00 for $3 Million Dollars in coverage limits.

**2.  Interpretation of Relevant Policy Provisions**

*a.  Insuring Agreement*

In Section I of the Canal Policies, Canal agreed to indemnify Montello for amounts it becomes legally obligated to pay as damages and expenses for *personal injury, property damage or advertising injury* arising out of an *occurrence*, as follows:

> **I.   Coverage:**  The company will indemnify the *insured* for all sums which the *insured* shall become legally obligated to pay as damages and expenses, all as hereinafter defined as included within the term *ultimate net loss*, by reason of liability

(a)     imposed upon the *insured* by law, or

(b)     assumed by the named *insured*, or by any officer, director, stockholder or employee thereof while acting within the scope of his duties as such, under any contract or agreement other than liability assumed with respect to occurrences talking place prior to the time such contract or agreement became effective.

because of

(i)     *personal injury* caused by, or

(ii)    *property damage* caused by, or

(iii)   *advertising liability* arising out of

an *occurrence* which takes place during the policy period anywhere in the world.

Under Section V of the Policies, the term *occurrence* is defined to mean "an accident which takes place during the policy period, or that portion of a policy period of a continuous or repeated exposure to conditions, which causes *personal injury*, *property damage* or *advertising liability* neither expected nor intended by the insured."  For these *occurrences*, Canal agreed to reimburse Montello's "Ultimate Net Loss," defined in Section V as follows:

**"Ultimate Net Loss"** means the total of the following sums arising with respect to each *occurrence* to which this policy applies:

(a)     all sums which the *insured*, or any organization as his insurer, or both, become legally obligated to pay as damages, whether by reason of adjudication or settlement, because of *personal injury*, *property damage* or *advertising liability*; and

(b)     all expenses incurred by the *insured* in the investigation, negotiation, settlement and defense of any claim or suit seeking such damages, excluding only the salaries of the *insured's* regular employees.

As such, it is clear that Canal did not undertake to insure the solvency of Motello's primary insurer in the Insuring Agreement.  Simply put, insolvency of the underlying insurer is not an *occurrence* that gives rise to *personal injury*, *property damage* or *advertising injury*.  To conclude otherwise would be to re-write the Canal Policies to insure a risk that was never intended.  *See B.P. America Inc. v. State Auto Property and Casualty Insurance Co*., 148 P.2d 832, 835-36 (Okla. 2005) (Courts should not "impose coverage where the policy clearly does not intend that a particular individual or risk should be covered.").  As the Fifth Circuit observed in a virtually identical case, "imposing the duty of indemnification on Canal would, in effect, transmogrify the Policy into one guaranteeing the solvency of whatever primary insurer the insured might choose."  *Continental Marble and Granite v. Canal Insurance Co.*, 785 F.2d 1258, 1259 (5th Cir. 1986).  The Fifth Circuit Court explained that excess insurance is coverage which, under the terms of the policy, only attaches after a predetermined amount of coverage has been exhausted.  Further,

> [the insured's] proposed rule would require insurance companies to scrutinize one another's financial wellbeing before issuing secondary policies.  The insurance world is complex enough; to impose this additional burden on companies such as Canal would only further our legal system's lamentable trend of complicating commercial relationships and transactions.

*Id.  See also, Steve D. Thompson Trucking, Inc. v. Twin City Fire Ins. Co.,* 832 F.2d 309, 311 (5th Cir. 1987) ("Excess insurers are not required to scrutinize primary insurers financial stability before issuing policies or to guarantee that the insured's choice of primary carriers will always be sound.").

Because excess insurance coverage is not triggered until after a predetermined amount of coverage has been exhausted, the actuarial risk associated with excess policies is reduced significantly.  This reduced risk is, of course, reflected in the cost of the policy.  *Id. See also,*

*e.g.*, *Zurich Ins. Co.*, 815 F.2d at 1126 (excess insurer "did not contract to bear the risk of the primary carrier's insolvency, nor do its premiums reflect the cost that assumption of this risk would entail").

Canal's implicit refusal to insure the solvency of Montello's primary insurer, Home, is reflected in the relatively small premium Canal received for very significant limits of excess coverage; $3,000.00 in 1981-82 and a mere $1,350.00 per year in 1983-85 for $3 Million of annual excess coverage.  In 1981, when Canal issued the first of its policies, no one conceivably could have predicted that Home would become insolvent in 2003, more than two decades later. Based on the low premium for the very significant limits of excess coverage, no reasonable insured could have expected Canal to have guaranteed the financial soundness of its primary insurers in perpetuity.  *See Padilla Construction Co, Inc. v. Transportation Insurance Co.*, 58 Cal. Rptr.3d 807, 811 (Cal. App. 4th Dist. 2007) ("Reasonable insureds don't expect to receive a defense from a typically much cheaper excess policy unless all the expensive primary insurance they bought has been exhausted").  *See also Ambassador Assoc. v. Corcoran*, 541 N.Y.S.2d 715, 717 (Sup. Ct. N.Y. 1980) (noting that the excess liability premiums paid for excess coverage "were substantially lower" than those paid for primary coverage, and concluding that "[t]his circumstance reflects the reduced risk all parties understood the out-layers insurers to be assuming" which "further supports the conclusion that no insolvency drop-down was intended"), *aff'd*, 168 A.D.2d 218 (1 Dept. 1990), *aff'd*, 589 N.E.2d 1258 (1992); *see also* 1 G. Couch, COUCH ON INSURANCE § 6:36 (3d ed. 2004) (most persuasive factor weighing against requiring an excess insurer to "drop down" is "the size of the premium charged for the excess insurance as compared to the premium for the underlying insurance").

This Court also rejects Montello's argument that the phrase "legally obligated to pay" in the definition of "ultimate net loss" in Canal's policies is ambiguous and contemplates nonpayment through insolvency or otherwise, and requires drop down due to Home's insolvency. Montello argues "the phrase 'legally obligated to pay' if not regarded as surplusage, posits an eventuality in which the insured, and hence the primary insurer, were liable but the insurer for some reason had not paid." [Doc. No. 156, 7]. According to Montello, this ambiguity compels the Court to interpret the Canal Policies in favor of the insured—requiring Canal to drop down.

Montello's argument depends upon its isolation of a single phrase in the Canal Policies, which is inappropriate under the general rules of contract construction.[3] The phrase "legally obligated to pay," therefore, must be read in conjunction with other provisions in the contract. The Court finds the Schedule of Underlying Policies, which deems the underlying Home insurance to be "in force," instructive as to the intended meaning of this phrase. [Doc. No. 147, Ex. 1 at 6, Ex. 2 at 14]. The Schedule of Underlying Policies provides: "It is agreed by the Named Insured that for the term of this policy the underlying coverages and limits described below are deemed to be in force and written without special restrictive endorsements and on standard forms in general use, except where noted." [*Id.*] Stated differently, the Schedule of Underlying Policies clearly provides that the Home Primary Insurance Policy is to *be regarded as in effect or valid* for purposes of the Canal Policies. As such, regardless of the actual status of the primary insurance, the Canal Policies are to be applied as if the Home Insurance was in force.

---

[3] Further, the cases cited by Montello in support of its strained interpretation of this phrase, *Rummel v. Lexington Co.*, 945 P.2d 970 (N.M. 1997), *Northmeadow Tennis Club, Inc. v. Northeastern Fire Ins. Co.*, 526 N.E.2d 1333 (Mass. App. 1988), *Fageol Truck & Coach Co. v. Pacific Indem. Co.*, 117 P.2d 669, 671 (Cal. 1941), and *Federal Ins. Co. v. Scarsell Bros., Inc.*, 931 F.2d 599, 604 (9th Cir. 1991), are unpersuasive because they are distinguishable and/or represent a minority view.

If Montello's interpretation of "legally obligated to pay" were adopted, then the clear language of the Schedule of Underlying Policies would be improperly ignored.

Accordingly, the Court finds that when read as a whole, the Canal Policies unambiguously state that Canal is only responsible for the payment of the *ultimate net loss* that results from an *occurrence* that exceeds the *underlying limit*; all clearly defined terms that belie any intention to drop down to cover the primary insurer's default of its obligation to provide first-dollar defense and indemnity coverage.

**b. The "Excess" verses "Umbrella" Clauses**

Montello next contends that because the Canal Policies provide "Umbrella" coverage above a $10,000.00 retained limit that those policies must drop down to cover claims that otherwise would have been covered by the insolvent primary insurer. While it is true that the Canal Policies include both "Excess" and "Umbrella" coverage, with different underlying/retained limits, only the "Excess" clause is applicable to the claims asserted in the underlying litigation. That intention is clearly reflected in Section II of the Canal Policies, which addresses the "Underlying Limit" of coverage, as follows:

> **II. Underlying Limit – Retained Limits.** The company shall be liable only for *ultimate net loss* resulting from any one *occurrence* in excess of either
>
> (a)    the amounts of the applicable limits of liability of the underlying insurance as stated in the Schedule of Underlying Insurance Policies less the amount, if any, by which any aggregate limit of such insurance has been reduced by payment of loss, hereinafter called the *underlying limit*, or
>
> (b)    If the insurance afforded by such underlying insurance is inapplicable to the *occurrence*, the amount stated in the declarations as the *retained limit*.

> The limits of liability of any underlying insurance policy shall be deemed applicable irrespective of any defense which the underlying insurer may assert because of the *insured's* failure to comply with any condition of the policy subsequent to an *occurrence*.

This provision is broken into two parts; (a) an excess clause that applies over and above the limits of the underlying insurance and (b) an umbrella clause that applies only when the underlying insurance is "inapplicable to the *occurrence*."  Neither of these unambiguous clauses creates a duty to drop down to assume the obligations of the insolvent primary insurer.

## 1.  The Excess Clause

With respect to losses covered by the Underlying Insurance, subparagraph (a) unambiguously provides that the Canal Policies are excess over the applicable limits of the policies listed in the Schedule of Underlying Policies, except to the extent that those limits have been reduced "by payment of loss."  The underlying insurer's inability to pay a loss is not equivalent to exhaustion by payment of loss. *See Mission Nat'l Ins. Co. v. Duke Transp. Co*., 792 F.2d 550, 553 (5th Cir. 1986) (insured's argument that the underlying policy was exhausted because insurer was unable to pay any claims under the policy failed because failure to pay claims was not the equivalent of exhaustion by payment of claims); *Molina*, 574 F.2d at 1178 (inability of primary insurer to pay policy limits does not equal exhaustion by reason of losses paid); *Wells Fargo Bank, N.A. v. California Insurance Guaranty Association*, 38 Cal. App. 4th 936, 944-45, (Cal. App. 1st Dist. 1995); *Interco Incorporated v. National Surety Corporation*, 900 F.2d 1264, 1268 (8th Cir. 1990).  An underlying insurer's limits are not "reduced by payment of loss" merely because the underlying insurer is unable to pay.  *Mission National Insurance Co. v. Duke Transportation Co., Inc.,* 792 F.2d 550, 553 (5th Cir. 1986); *Guaranty National Ins. Co. v. Bayside Resort, Inc.,* 635 F.Supp. 1456 (D. Md. 1986).

Here, the Home Policies have not been exhausted by payment of loss, because Home has never paid any claims in connection with the underlying asbestos litigation.   Additionally, Montello has not expended any of its own funds in the settlement or payment of claims sufficient to exhaust the applicable limits of a single Home policy.   Unless and until these limits have been exhausted by payment of loss, Canal has no obligation to defend or indemnify under the excess clause.

## 2.  The Umbrella Clause

Subparagraph (b) of Section II of the Canal Policies is an umbrella insurance clause that provides coverage in excess of the retained limit, in this case $10,000.00, in the event that "the insurance afforded by such underlying insurance is inapplicable to the *occurrence*."   Umbrella insurance provides primary coverage only in situations where the underlying insurance provides no coverage at all.  *American Special Risk Ins. Co. v. A-Best Products, Inc*., 975 F.Supp. 1019, 1021 (N.D. Ohio 1997); *Macalco, Inc. v. Gulf Ins. Co*., 550 S.W.2d 883, 896 (Mo. App. 1977) (underlying policy "inapplicable to the occurrence" where it did not provide coverage for accident involving operation of airplane by student pilot).  The theory behind umbrella insurance coverage is that the insured protects itself against catastrophic loss by the procurement of insurance coverage that takes up where its primary policy leaves off.   Conversely, where the primary policy is applicable to the occurrence, umbrella insurance is not.  *Coates v. Northlake Oil Co., Inc.,* 499 So.2d 252, 255-56 (La. App. 1st Cir. 1986), *cert. denied*, 503 So.2d 476 (La. 1987).

Like the excess clause, the umbrella clause provides coverage only with respect to *occurrences* covered by the policy.  *See Allied Corp. v. Frola,* 1992 U.S. Dist. LEXIS 15778 *35 (D. N.J. 1992), *citing*, J. Appleman, *Insurance Law and Practice* §4909.85.   As previously

stated, the term *occurrence* is specifically defined to refer to an accident that results in *personal injury*, *property damage* or *advertising injury*.  Home's insolvency is not an *occurrence* to which the underlying policy is inapplicable because it is not an *occurrence* at all.  *Value City, Inc. v. Integrity Ins. Co.,* 30 OhioApp.3d 274, 508 N.E.2d 184, 188 (Ohio App. 10th Dist. 1986).

Courts considering the identical policy language have held that the underlying policy is not rendered "inapplicable to the *occurrence*" merely because the underlying insurer becomes insolvent.  *Continental Marble and Granite v. Canal Ins. Co.,* 785 F.2d 1258, 1259 (5th Cir. 1986); *Harville v. Twin City Fire Ins. Co.*, 885 F.2d 276, 278 nn. 1 & 2 (5th Cir. 1989); *U.S. Fire Ins. Co., Inc. v. Charter Financial Group, Inc*., 851 F.2d 957, 961 (7th Cir. 1988) ("The majority of courts…have found that in the absence of language promising to pay above amounts 'recoverable,' excess insurance contracts do not obligate the excess insurer to provide primary coverage when the underlying insurance has become insolvent."), *quoted in, Hudson Insurance Co. v. Gelman Sciences, Inc*., 921 F.2d 92, 45 (7th Cir. 1990).  The phrase "inapplicable to the *occurrence*" references the underlying policy's terms rather than the solvency of the insurer writing it, and reflects the intention to trigger umbrella coverage only in cases where the primary policy does not provide coverage.  *Macalco, Inc. v. Gulf Ins. Co.*, 550 S.W.2d 883, 896 (Mo. App. 1977).

Cases cited by Montello to the contrary rely on terms not present in the Canal Policies.  When an excess policy provides that it will pay above amounts "recoverable" or "collectible" from the underlying insurers, other courts have construed such policies to provide coverage in excess of the retained limit when the insured is not able to recover or collect from its underlying insurers.  *See Reserve Ins. Co. v. Pisciotta,* 30 Cal.3d 800, 640 P.2d 764 (1982) ("recoverable"); *Gros v. Houston Fire & Casualty Ins. Co*., 195 S.W.2d 674, 676 (La. App. 1967) ("collectible").

*See also Highlands Ins. Co. v. Gerber Products Co.,* 702 F.Supp. 109, 112 (D. Md. 1988) (distinguishing cases involving terms "collectible" or "recoverable").  In those cases, the policies specifically linked the umbrella clause to the recoverability or collectability of the underlying insurance.  No such language appears anywhere in the Canal Policies and these cases therefore are not persuasive.

Montello admits that the Home Policies cover asbestos-related liabilities and that Home's policies included a duty to defend Montello in the underlying asbestos litigation.  [*See* Montello's Response to Requests for Admissions 15, 17, 19, 20, 22, 23, 25 and 27].  Because the Home Policies afforded coverage for the claims asserted in the underlying litigation, they are "applicable," not "inapplicable," to the *occurrence*, such that the "Umbrella" clause and its lower retained limit do not apply.

**b.  The "Other Insurance" Clause.**

At paragraph 9, the Policy Conditions provide that:

> **9.     Other Insurance:**  The insurance afforded by this policy shall be excess insurance over any other valid and collectible insurance available to the *insured*, whether or not described in the Schedule of Underlying Insurance Policies, (except insurance purchased to apply in excess of the sum of the *underlying limit* or *retained limit* and the limit of liability hereunder) and applicable to any part of *ultimate net loss*, whether such other insurance is stated to be primary, contributing, excess or contingent; provided that if such other insurance provides indemnity only in excess of a stated amount of liability per occurrence, the insurance afforded by this policy shall contribute therewith with respect to such part of *ultimate net loss* as is covered hereunder but the company shall not be liable for a greater proportion of such loss than the amount which should have been payable under this policy bears to the sum of said amount and the amounts which would have been payable under each other excess indemnity policy applicable to such loss, had each such policy been the only policy so applicable.

The phrase "other valid and collectible insurance" in this paragraph unambiguously refers to those "other" policies not identified in the Schedule of Underlying Policies, and conversely does not refer to the underlying Home policy identified in the Schedule of Underlying Policies. *See Alaska Rural Elec. Co-op Ass'n, Inc. v. INSCO Ltd.*, 785 P.2d 1193, 1196 (Alaska 1990); *Mission National Ins. Co.*, 792 F.2d at 555 (5th Cir. 1986) (term "other valid and collectable insurance" refers to insurance in addition to the underlying primary policy); *Wells Fargo Bank, N.A.*, 38 Cal. App. 4th at 950-51; *Ware*, 727 F.Supp. at 306 (citing majority rule distinguishing scheduled and non-scheduled insurance for purposes of "other insurance" clause); *Steve D. Thompson Trucking, Inc.*, 832 F.2d at 311 (term "'over any other valid and collectable insurance' does not require or imply that the listed primary insurance…must be collectable to be counted as part of the underlying limit"); *Radar v. Duke Transportation Co.*, 492 So.2d 532 (La. App. 3d Cir. 1986). The unambiguous intention of this provision is to make the Canal Policies excess over the scheduled policies and all other valid and collectable primary insurance applicable to the occurrence. It does not require Canal to assume the obligations of underlying insurers listed in the Schedule of Underlying Policies simply because those insurers are no longer able to fulfill their obligations.

In response, Montello cites *Gulezian v. Lincoln Ins. Co.*, 506 N.E.2d 1233 (Mass. 1987), an often criticized[4] and readily distinguishable case in which the court found ambiguity in the "deemed applicable" clause in the definition of underlying limits, which associated the word "applicable" modifying "limits of liability" with the term "collectible." The underlying limit provision in the policy in *Gulezian*, Section III, states that the company will be liable only for ultimate net loss resulting from any one occurrence in excess of:

---

[4] *See Barrett*, 843 F.Supp. at 786 (citing subsequent Massachusetts decisions have declined to follow *Gulezian*); *Span, Inc. v. Associated International Insurance Company*, 227 Cal. App. 3d 463, 477 (Cal. App. 2d Dist. 1991) (questioning rationale).

(a) the total of the applicable limits of liability of the Underlying Insurance as stated in the Schedule of Underlying Insurance and the applicable limits of any other Underlying Insurance collectible by the Insured, less the amount, if any, by which any aggregate limit of such insurance has been reduced by payment of loss during the period of this Policy, hereinafter called the Underlying Limit …. The limits of liability of any Underlying Insurance Policy shall be deemed applicable irrespective of any defense which the underlying insurer may assert because of the insured's failure to comply with any condition of the Policy subsequent to an occurrence.

*Id.* at 124 n.2.  The Massachusetts Court found ambiguity in the fact that the policy specified that excess insurance would *not* drop down to cover the loss of primary coverage due to the post-occurrence fault of the insured, but did not specify what would happen if the primary insurance became uncollectible through no fault of the insured, as in the case of insolvency.

The finding in *Gulezian* based on the purported "ambiguity" in that policy and the failure to specify what would occur upon insolvency of the primary carrier was rejected in *Span, Inc. v. Associated Int'l Ins. Co.*, 227 Cal. App.3d 463 (Cal. Ct. App. 1991):

We empathize with the rationale in *Gulezian*.  One reason for the failure of excess policies to provide for the insolvency of the primary carrier lies in the fact that the exhaustion by payment language has prevented "drop down" in every jurisdiction which has construed a policy with that phrase.  Excess insurers understandably are loathe to deviate from terminology that has been accepted.

However, California law … requires only that ambiguity be resolved in favor of the insured.  It does not require the policy to make specific provision for the insolvency of the primary carrier.  Because only payment of the underlying limit will trigger Associated's insuring agreement, insolvency of the primary carrier is excluded, indirectly, but unambiguously, as a means of exhaustion of the underlying policy.

We therefore agree with the numerous foreign cases which have concluded the phrase "exhaustion … by reason of losses paid thereunder," or similar language precludes an obligation of the excess insurer to drop down upon the insolvency of the primary insurer.

*Id.* at 477-78. *See also Barrett v. Chin*, 843 F. Supp. 783 (D. Mass. 1994) (relying on *Massachusetts Bay Trans. Auth. v. Allianz Ins. Co.*, 597 N.E.2d 439 (Mass. 1992) and *Vickodil v. Lexington Ins. Co.*, 587 N.E.2d 777 (Mass. 1992) – and not on *Gulezian* – to find that excess insurance policies were not ambiguous and did not require excess insurers to drop down due to insolvency of lower tier excess insurers, noting that *Vickodil* and *Allianz* "signal[ed] a direction different from" *Gulezian*).

Further, this Court agrees with those courts which have found that a primary insurer's insolvency does not serve to exhaust or reduce the applicable underlying limit of liability. *See Interco, Inc. v. National Surety Corp.*, 900 F.2d 1264, 1268 (8th Cir. 1990) ("If an excess insurance policy requires the excess insurer to indemnify the insured for losses in excess of the amount specified in an underlying policy, the insolvency of the underlying insurer should not create a lower minimum threshold triggering liability on the part of the excess insurer."); *Radiator Specialty Co.*, 651 F. Supp. at 443 (holding that excess insurer was not required to "drop down" and pay amounts below underlying limit due to primary insurer's insolvency; excess insurer agreed to insure plaintiff against ultimate net loss in excess of amount equal to $500,000 limit of underlying insurance listed in Schedule A, and plaintiff had not yet paid that amount); *Value City, Inc.*, 508 N.E.2d at 187-88 (holding primary insurer's insolvency is not "occurrence" and does not serve to exhaust or reduce limits of underlying policy and trigger excess insurer's liability under insuring agreements).

Nevertheless, no similar language appears in the Canal Policies, which unambiguously define the underlying limit to mean the limits of the underlying insurance policies less the amount, if any, by which such limits have been reduced by payment of loss. The reduction of the underlying limit solely by payment of loss precludes the reduction or exhaustion of limits due

to the insolvency of the primary insurer.  *Highlands*, 702 F.Supp. at 113.  Therefore, the Court finds that the "Other Insurance" provision of the Canal Policies does not require Canal to "drop down" to assume the obligations of Montello's insolvent primary insurer.

**d.  The Defense Endorsement.**

Finally, the Canal Policies include the following Defense Endorsement

With respect to such insurance as is afforded by this policy, if there is no underlying insurer obligated to do so, the Company shall:

(a)    defend any suit against the Insured alleging personal injuries (including death resulting therefrom), property damage or advertising liability and seeking damages on account thereof, even if such suit is groundless, false or fraudulent; but the Company may make such investigation, negotiation and settlement of any such suit as it deems expedient;

(b)    (1)    pay all premiums on bonds to release attachments

for an amount not in excess of the limit of liability of this policy and all premiums on appeal bonds required in any such defended suit, but without any obligation to apply for or furnish any such bonds;

(2)    pay all expenses incurred by the Company, all costs taxed against the Insured in any such suit and all interest accruing after entry of judgment until the Company has paid or tendered or deposited in court such part of such judgment as does not exceed the limit of the Company's liability thereon;

(3)    reimburse the Insured for all reasonable expenses, other than loss of earnings, incurred at the Company's request;

and the amounts so incurred, except settlements of claims and suits, shall be payable by the Company in addition to the limit of liability of this policy and without inclusion in "ultimate net loss."

This provision is unequivocal in stating that Canal's duty to defend the insured arises only if two conditions are met: 1) the defense involves a claim for which the Canal Policies provide coverage; and 2) there is no underlying insurer *obligated* to defend.  What the defense

endorsement does is simply to change Canal's obligation from one of reimbursing the insured for expenses incurred in negotiating, settling and defending the claim (as provided in subparagraph (b) of the definition of "Ultimate Net Loss" and in paragraph 5 of the Policy Conditions) [5] to one of defending the insured at the Company's own expense. *See American Casualty Co. of Reading v. Rahn*, 854 F.Supp. 492, 504 (W.D. Mich. 1994) ("duty to defend clauses and reimbursement clauses are two different things"). The Defense Endorsement does not change *when* Canal has the duty to defend. The Defense Endorsement provides a valuable benefit to the insured. Without it, the expenses incurred in defending claims against the insured are included within the "Ultimate Net Loss" so as to erode the $3 Million policy limit. With it, all of those limits are available for payment of claims. *Carlson Marketing Group v. Royal Indemnity Co.*, 517 F.Supp.2d 1089, 1115 (D. Minn. 2007). The Defense Endorsement does not transform Canal's excess policy into a performance bond forever insuring the solvency of the primary insurer.

Montello relies exclusively on the case of *Washington Insurance Guaranty Association v. Guaranty National Insurance Co.*, 685 F.Supp. 1160 (W.D. Wash. 1988), for the proposition that Canal specifically contracted to "drop down" with respect to defense costs. *Washington*, however, does not support the proposition for which it is cited. The issue in *Washington* was whether an excess insurer (GNIC) or the State Guaranty Association had the duty to defend an insured whose primary insurer had gone bankrupt. The District Court held that GNIC had no duty to defend or indemnify until or unless the damages or judgment exceeded the limits of the insolvent insurer's primary policy. This was so despite the fact that the GNIC policy was excess over a $500,000 primary policy, while the State Guaranty Association provided coverage only up to its $300,000 statutory limit, leaving a $200,000 "gap" in coverage.

---

[5] Section 5 of the Policy Conditions states, in pertinent part: "The *insured* shall be responsible for the investigation, settlement or defense of any claim made or suit brought or proceeding against the *insured* which no underlying insurer is obligated to defend … ."

The *Washington* court's analysis allowed GNIC and the Guaranty Association to function as both were intended.  GNIC provided coverage only in excess of $500,000 as it had contracted to do, and the Association providing coverage up to its $300,000 statutory mandate.  The court further noted that it would be unfair to shift the burden of defending the insured to GNIC, as it did not contract to insure the risk of the primary insurer's insolvency.  While the *Washington* court suggested *in dicta*, that if the Association did not exist, GNIC might "want to be able to defend the insured" to protect GNIC's own interests, it did not address the issue of whether GNIC had an obligation to do so.

The case of *Harville v. Twin City Fire Insurance Company*, the Fifth Circuit specifically addressed the issue of whether a primary insurer's insolvency extinguished its duty to defend. *See* 885 F.2d 276.  That Court held that the primary insurer's insolvency did not relieve it of the obligation to defend.  As the *Harville* court observed:

> To hold that [the primary insurer's] "obligation" to defend was extinguished upon [the primary insurer's] insolvency would re-write the excess liability policy to place a risk on [the excess insurer] which [it] never agreed to assume.  Specifically, we would be making [the excess insurer] an insurer not only of [the insured's] excess liability, but of [the primary insurer's] financial ability to defend as well.

*Id.* at 279.

As the *Harville* court recognized, the primary insurer's insolvency may affect its *ability* to defend, but does not extinguish its *obligation* to defend.  To conclude otherwise would re-write the excess policy to place a risk that the excess insurer never agreed to assume and for which it did not assess a premium; namely, the underlying carrier's financial ability to fulfill its contractual obligation to defend its insured.  *See, e.g., Continental Marble & Granite*, 785 F.2d at 1259; *Zurich Ins. Co.*, 815 F.2d 1122; *American Re-Insurance v. SGB Universal Builders Supply, Inc.*, 532 N.Y.S.2d 712, 714 (1988).  As *Harville* and other courts have said time and

time again, excess insurers are able to provide low cost coverage with high dollar limits because the primary duty to defend and indemnify rests with the primary insurers. *Id.*

Moreover, nothing in the Defense Endorsement suggests an undertaking to provide a defense in the case of an underlying insurer's insolvency. To the contrary, the Defense Endorsement, like all other endorsements to the Canal Policies, specifically states in pertinent part that:

> This endorsement shall be subject to all other terms, provisions and conditions of the Policy to which it is attached, and nothing herein contained shall vary, alter or extend any term, provision or condition of the policy except as herein specifically stated.

Rather than appearing in isolation, the Defense Endorsement therefore must be read in conjunction with the "Other Insurance" clause, which provides that the Canal Policies are excess over all other valid and collectable primary insurance, and the Loss Payable Clause, which states that liability under the Canal Policies does not attach unless and until the underlying insurer has paid its limits. *See Essex Ins. Co. v. Vincent*, 52 F.3d 894, 897 (10th Cir. 1995) ("An insurance policy and an endorsement attached to it must be considered as a single instrument, and they should be construed together in the absence of an internal conflict which cannot be reconciled."). To date, none of Montello's primary policies have been exhausted through payment of their respective limits.

Accordingly, Canal's Motion for Summary Judgment must be granted.[6]

## E. Houston General's Motion for Summary Judgment

## 1. Houston General Policies

---

[6] Montello has moved for Partial Summary Judgment with respect to Canal and Third-Party Defendant Houston General Insurance Company, seeking a determination that these "Umbrella Insurers" must indemnify Montello for its defense costs with respect to an asbestos claim for triggered coverage if Montello selects that Underlying Insurer's policy. For the reasons set forth herein, the Court holds that Montello's motion must be DENIED. As stated herein, an excess insurer's duty to defend does not arise until and unless the underlying limits of coverage have been exhausted by payment of loss.

Houston General issued three policies of insurance to Montello that collectively provided insurance coverage from December 1978 through March 1981 (the "Houston General Policies"). The Houston General Policies provided $2 million of first-layer excess coverage over the underlying limits of the policies set forth on the "Schedule of Underlying Policies."  Pursuant to the Schedule of Underlying Policies, Home was identified as the CGL Primary Carrier, with a $500,000 per occurrence and $500,000 aggregate limit of liability for bodily injury with regard to Policy No. 5 XS 961702, and a $500,000 combined single limit of liability with regard to Policy No. 5 XS 980662 and Policy No. 5 XS 116867.

## 2.  Interpretation of Relevant Policy Provisions

The Court notes that the Houston General Policies and the Canal Policies examined above, contain, in relevant part, similar provisions.[7]  Furthermore, in its Response in Opposition to Houston General's Joinder in the Motion for Summary Judgment, [Doc. No. 153], Montello presents arguments nearly identical to the arguments made in its Response in Opposition to Canal's Joinder in the Motion for Summary Judgment, [Doc. No. 153].[8]  As explained herein, the Court finds these arguments unpersuasive.   Accordingly, Houston General's Motion for Summary Judgment must be granted.

## D.  Scottsdale's Motion for Summary Judgment

## 1.  Scottsdale Policy

Scottsdale issued a policy of insurance to Montello, Scottsdale Policy UMB004434 (the "Scottsdale Policy"), which provided coverage for the policy period from March 1, 1985 through

---

[7] *Compare*, Houston General Policy No. "5 XS 96 17 02," Doc. No. 150, Ex. 1 at 1-9, Houston General Policy No. "5 XS 98 06 62," Doc. No. 150, Ex. 1 at 10-20, and Houston General Policy No. "5 XS 11 69 67," Doc. No. 150 Ex. 1 at 21-36, with Canal Policy No. "XS 000563," Doc. No. 147, Ex. 1, and Canal Policy No. "XS 00 79 88," Doc. No. 147, Ex. 2.

[8] The arguments contained in the two response briefs differ primarily with regard to the "Defense Dropdown Provision," which appears in the Canal Policies, but not the Houston General Policies.

March 1, 1986. The Scottsdale Policy provided a limit of coverage for $3,000,000 per occurrence and $10,000 retained limit. The Coverage Section of the Scottsdale Policy provided:

> [Scottsdale] hereby agrees to indemnity to the insured for all sums which the insured shall become legally obligated to pay by reason of liability imposed upon the insured by law or assumed under contract or agreement by the insured arising out of (A) Personal injury (B) Property damage (C) Advertising liability caused by an occurrence happening anywhere.

The Scottsdale Policy also provides that Scottsdale shall only be liable for the ultimate net loss in excess of the greater of the insured's:

> (A) Underlying Limit - An amount equal to the Limits of Liability indicated beside the underlying insurance listed in the Schedule of Underlying Insurance (Schedule A), plus the applicable limits of any other underlying insurance collectible by the INSURED; or

> (B) Retained Limit- The amount specified in Item 3 of the Declarations as the result of any one occurrence not covered by said underlying insurance, and which shall be borne by the INSURED.

Further, the Scottsdale Policy's "Other Insurance" Provision states:

> **(F) OTHER INSURANCE:** The insurance afforded by this policy shall be excess over any other valid and collectible insurance available to the INSURED, whether or not described in the Schedule of Underlying Insurance (Schedule A), except Insurance purchased to apply as excess of the sum of the Underlying Limit(s) or retained limit and the limit of liability hereunder, and applicable to any part of the ULTIMATE NET LOSS, whether such other insurance is stated to be primary, contributing, excess or contingent; ... .

Finally, in the Conditions Section of the Scottsdale Policy, it provides in Section J, entitled

"**Maintenance of Underlying Insurance(s)"**:

> In the event there is no recovery available to the INSURED as a result of insolvency of the underlying insurer or by reason of the INSURED having breached the contract of underlying insurance, the coverage hereunder shall apply in excess to the applicable limit of liability specified in the Schedule of Underlying Insurance (Schedule A).

**2.  Interpretation of Relevant Policy Provisions**

The Court finds that Scottsdale is not required to "drop down" to assume any of the obligations of the insolvent primary insurers.  As explained by Montello in its Response: "Montello respectfully agrees that [the] language [contained in the "Maintenance of Underlying Insurance(s) Section] controls, and that the Scottsdale Umbrella does not drop down upon the event of Home's insolvency."  [Doc. No. 155, 11].  There is no genuine dispute regarding Home's status as an insolvent primary insurer.  Consequently, the Scottsdale Policy is excess over any other valid and collectible insurance available to the insured, whether or not described in the Schedule of Underlying Policies.  Accordingly, Scottsdale's Motion for Summary Judgment must be granted.

**F.  Twin City and Hartford's Joint Motion for Summary Judgment**

**1.  Twin City Policy**

Twin City issued Liability Policy No. TXU 101400 to Montello for the policy period of March 1, 1982 – March 1, 1983 (the "Twin City Policy").  The Twin City Policy has a limit of $3,000,000 per occurrence and $3,000,000 in the aggregate.  The Twin City Policy contains the following insuring agreement:

**I  Coverage**

The Company will indemnify the **insured** for **ultimate net loss** in excess of the **underlying limit** or the **self-insured retention**, whichever is greater, because of:

    (a) **bodily injury**,

    (b) **personal injury**,

    (c) **property damage** or

    (d) **advertising injury**

to which this insurance applies, caused by an **occurrence** which takes place anywhere in the world.

The Twin City Policy contains the following pertinent definitions:

### V  Definitions

When used in this policy (including endorsements forming a part hereof):

* * *

"**underlying limit**" means with respect to each **occurrence** to which this policy applies the amounts of the applicable limits of liability in the underlying insurance as stated in the Schedule of Underlying Insurance Policies less the amount, if any, by which any aggregate limit of such insurance has been reduced by payment of loss….

"**named insured's products**" means goods or products manufactured, sold, handled or distributed by the **named insured** or by others trading under his name, including any container thereof (other than a vehicle) but "**named insured's products**" shall not include a vending machine or any property other than such container, rented to or located for use of others but not sold;

* * *

"**products hazard**" includes **bodily injury** and **property damage** arising out of the **named insured's products** or reliance upon a representation or warranty made at any time with respect thereto, but only if the **bodily injury** or **property damage** occurs away from the premises owned or rented to the **named insured** and after physical possession of such products has been relinquished to others;

The Twin City Umbrella Policy contains the following conditions:

### Conditions

#### 8. Other Insurance

The insurance afforded by this policy shall be excess insurance over any other valid and collectible insurance (except when purchased specifically to apply in excess of this insurance) available to the **insured**, whether or not described in the Schedule of Underlying Insurance Policies, and applicable to any part of **ultimate net loss**….

* * *

#### 14. Maintenance of Underlying Insurance

Each policy described in the declarations shall be maintained in full effect during the currency of this policy, except for any reduction of the aggregate limit or limits contained therein solely by payment of claims in respect of **occurrences**

taking place during the period of this policy. Failure of the **named insured** to comply with the foregoing shall not invalidate this policy but in the
event of such failure, the Company shall be liable only to the extent it would have been liable had the **named insured** complied therewith.

Further, Endorsement No. 2 to the Twin City Policy states:

<u>SCHEDULE OF UNDERLYING
INSURANCES</u>

IT IS UNDERSTOOD AND AGREED THAT THE SCHEDULE OF UNDERLYING INSURANCES IS AS FOLLOWS:

| <u>CARRIER</u> | <u>TYPE OF POLICY</u> | <u>LIMITS OF LIABILITY</u> |
|---|---|---|
| Home Insurance Company | Comprehensive General Liability | $500,000 Combined Single Limit For Bodily Injury and Property Damage |
| Home Insurance Company | Automobile | $500,000 Combined Single Limit For Bodily Injury and Property Damage |
| Home Insurance Company | Employers Liability | $100,000, One Accident |

Further, Endorsement No. 6 to the Twin City Policy states:

**Products and Completed Operations Following Form**

It is understood and agreed that the insurance afforded by this policy shall not apply with respect to any liability arising out of the products or completed operations hazards as defined in this policy unless such liability is covered by valid and collectible underlying insurance at the limits shown in the schedule of underlying insurance, but only for such hazards for which coverage is afforded by said underlying insurance.

**2.  Interpretation of Relevant Policy Provisions**

Hartford asserts that it has no obligation to defend or indemnify Montello under the Twin City Policy for the Underlying Claims/Lawsuits for two reasons: (1) the application of the Products and Completed Operations Following Form Endorsement ("Products Endorsement");

and (2) coverage under the Twin City Policy only applies "in excess of" the "underlying limit,"

which has not been exhausted.

The Products Endorsement provides the following:

It is understood and agreed that the insurance afforded by this policy shall not apply with respect to any liability arising out of the ***products or completed operations hazards*** as defined in this policy unless such liability is covered by valid and collectible underlying insurance at the limits shown in the schedule of underlying insurance, but only for such hazards for which coverage is afforded by said underlying insurance.

(Emphasis added).

The Court finds that the Products Endorsement clearly and unambiguously bars coverage

for liability claims and lawsuits within the "products hazard" which are not covered by valid and

collectible underlying insurance at the limits scheduled in the Twin City Policy.  The Twin City

Policy defines "products hazard" as follows:

"**products hazard**" includes **bodily injury** and **property damage** arising out of the **named insured's products** or reliance upon a representation or warranty made at any time with respect thereto, but only if the **bodily injury** or **property damage** occurs away from the premises owned or rented to the **named insured** and after physical possession of such products has been relinquished to others …

(emphasis original).

Significantly, Montello admits that its liability in the Underlying Claims/Lawsuits arises

out of products that it "manufactured, sold, distributed or otherwise put into the stream, of

commerce."   Therefore, the definition of "products hazard" in the Twin City Policy is met.

Montello also admits that coverage for the Underlying Claims/Lawsuits under the Home policies

at the limits shown in the schedule of underlying insurance is "uncollectible" as a result of

Home's insolvency.  Thus, there is no collectible insurance underlying the Twin City Policy.  On

this record, the application of the Products Endorsement to the Underlying Claims/Lawsuits is

supported by the undisputed facts.  Hartford, therefore, has no obligation to defend or indemnify Montello for the Underlying Claims/Lawsuits.

Montello argues the Products Endorsement does not bar coverage under the Twin Cities Policies for two main reasons.  First, Montello argues that the endorsement is inapplicable because it can purchase "a new primary policy for the policy period that has a $500,000 limit for products liability."  [Doc 154, 8].  Second, Montello argues that the Products Endorsement "does not apply to negligence causes of action which are always a part of the Underlying Litigation" [*Id.*]  The Court finds both of these arguments completely meritless.

With regard to Montello's first argument, a party cannot defeat a motion for summary judgment based on facts that are not in the record.  *See Truhlar v. United States Postal Serv.*, 600 F.3d 888, 893 (7th Cir. 2010); *Razzaboni v. Schifano*, 378 F.3d 60, 67 (1st Cir. 2004); *Bryant v. Bell Atl. Md., Inc.*, 288 F.3d 124, 134-135 (4th Cir. 2002).  As aptly stated by Twin City, "Montello has placed no evidence in the record stating that it looked to purchase such insurance, may purchase such insurance, or, perhaps most importantly, could purchase such insurance where, as here, the asbestos products claims against Montello are known and the loss is no longer fortuitous."  [Doc. No. 168, 3-4].  Accordingly, the Court declines to incorporate Montello's hypothetical circumstances into the record before the Court.

Montello's second argument is equally infirm.  The Court notes that Montello failed to provide any factually or legal support for its contention that the Products Endorsement "does not apply to negligence causes of action which are always part of the Underlying Litigation."  [Doc. No. 154, 10].  As explained by the Seventh Circuit: "[j]udges are not like pigs, hunting for truffles buried in briefs."  *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003).  Nevertheless, based on the Court's reading of the Products Endorsement, there is no basis upon which to conclude

that the Products Endorsement does not apply to negligence causes of action.

Accordingly, the Court finds that Twin City is entitled to summary judgment based on the Products Endorsement.[9]   Because the Court finds that the Products Endorsement bars coverage under the Twin City Policy, the Court need not address whether the Twin City Policy would otherwise be required to "drop down."[10]

## G.  Continental's Motion for Rule 54(b) Certification

Federal Rule of Civil Procedure 54(b) provides, in relevant part, that "the court may direct the entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay."   The Tenth Circuit has instructed that "the district court should act as a 'dispatcher' weighing Rule 54(b)'s policy of preventing piecemeal appeals against the inequities that could result from delaying an appeal." *Stockman's Water Co., LLC v. Vaca Partners, L.P.*, 425 F.3d 1263, 1265 (10th Cir. 2005) (citing *Curtiss–Wright corp. v. General Elec. Co.*, 446 U.S. 1, 8 (1980)).   Courts should be mindful not only of judicial efficiency, but also of basic principles of justifiability that define the "duties of both the district court and the appellate court."   *Ginett v. Computer Task Grp., Inc.*, 962 F.2d 1085, 1095 (2d Cir. 1992).   Thus, district courts "should avoid the possibility that the ultimate dispositions of the claims remaining in the district court could either moot [a] decision on the appealed claim or require [the appellate court] to decide issues twice."   *Id.*

---

[9] Twin City's parent company, Hartford, is a Third Party Defendant in this action.  Montello alleges that Hartford is liable to Montello because it is the "alter ego" of Twin City.  *See* Doc. No. 22 (Montello's Third Party Complaint). Because Twin City is entitled to summary judgment, Montello's claim against Hartford fails as a matter of law.

[10]   Even if the Products Endorsement did not bar coverage, the Court finds that the Twin City Policy does not "drop down" to replace the Underlying Home Policy as a result of Home's insolvency.  The Court notes that the Twin City Policy and the Canal Policies examined above, contain, in relevant part, very similar provisions.  [*Compare*, Twin City Policy No. "TXU 101 400," Doc. No. 149, Ex. 1 at 3-17, with Canal Policy No. "XS 000563," Doc. No. 147, Ex. 1, and Canal Policy No. "XS 00 79 88," Doc. No. 147, Ex. 2].  Furthermore, in its Response in Opposition to Twin City's Joinder in the Motion for Summary Judgment, [Doc. No. 154], Montello presents arguments nearly identical to the arguments made in its Response in Opposition to Canal's Joinder in the Motion for Summary Judgment, [Doc. No. 153].  As discussed in detail above, the Court finds these arguments unpersuasive.

When considering whether to grant a request for certification under Rule 54(b), a district court must make two determinations.

> First, the district court must determine that the order it is certifying is a final order. Second, the district court must determine that there is no just reason to delay review of the final order until it has conclusively ruled on all claims presented by the parties to the case.

*Okla. Tpk. Auth. v. Bruner*, 259 F.3d 1236, 1242 (10th Cir. 2001) (citations omitted).  "In order to determine whether an order is 'final' a district court must first consider the separability of the adjudicated and unadjudicated claims."  *Inola Drugs, Inc. v. Express Scripts, Inc.*, 390 F. App'x 774, 775 (10th Cir. 2010) (unpublished) (citing *Jordan v. Pugh*, 425 F.3d 820, 826 (10th Cir. 2005)).  In determining whether claims are separable, the Court considers "whether the allegedly separate claims turn on the same factual questions, whether they involve common legal issues, and whether separate recovery is possible."  *Id.* at 776 (citations omitted).

After careful consideration of the circumstances of this case, the Court finds that Continental has not demonstrated that there is no just reason for delay.  This case involves a variety of complex issues, the resolution of which may have an effect on the significance of the Court's October 15, 2012 *Opinion and Order*.  Accordingly, in the interest of judicial economy, Continental's Motion for Rule 54(b) Certification must be denied.

**CONCLUSION**

For the reason's outlined above, the Insurer's Joint Motion for Summary Judgment, [Doc. No. 146], and the parties respective joinders therein, [Doc. Nos. 147, 149, 150, & 151], are **GRANTED**.  Further, Montello's Motion for Partial Summary Judgment, [Doc. No. 157], and Continental's Motion for Rule 54(b) Certification, [Doc. No. 142], are **DENIED.**  In addition, Montello's Motion to Amend, [Doc. No. 176], and Montello's Motion to Clarify, [Doc. No. 176], are **STRICKEN**.

James H. Payne
United States District Judge
Northern District of Oklahoma